**In re SEALED CASE (Three Cases).**

**Nos. 87–5261, 87–5264 and 87–5265.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1987.

Decided Jan. 22, 1988.

As Amended Feb. 5, 1988.

Probable Jurisdiction Noted Feb. 22, 1988.
See 108 S.Ct. 1010.

Barry S. Simon with whom Brendan V. Sullivan, Jr., Nicole K. Seligman, Jacob A. Stein and Robert F. Muse, Washington, D.C., were on the joint brief, for appellants in 87–5261 and 87–5265.

Thomas S. Martin with whom Anthony C. Epstein, David E. Zerhusen, David W. De-Bruin and Carl S. Nadler, Washington, D.C., were on the brief, for appellant in 87–5264.

Earl C. Dudley, Jr., Deputy Independent Counsel, with whom Alexia Morrison, Independent Counsel and Richard C. Otto, Deputy Independent Counsel, Washington, D.C., were on the brief, for appellee in 87–5261, 87–5264 and 87–5265.

Douglas N. Letter, Dept. of Justice, with whom James M. Spears, Acting Asst. Atty. Gen., Robert J. Cynkar, Deputy Asst. Atty. Gen., Robert E. Kopp, William Kanter, Neil Koslowe, Jay S. Bybee, Dept. of Justice, Washington, D.C., were on the brief, for amicus curiae, U.S., urging reversal.

Steven R. Ross, General Counsel to the Clerk, U.S. House of Representatives, with whom Charles Tiefer, Deputy General Counsel, Michael L. Murray and Janina Jaruzelski, Asst Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., were on the brief, for amicus curiae, Speaker and Bipartisan Leadership Group of the U.S. House of Representatives, urging affirmance.

Herbert J. Miller, Jr., Randall J. Turk and Stephen L. Braga, Washington, D.C., were on the brief, for amicus curiae, Michael K. Deaver, urging reversal.

Eric R. Glitzenstein and Alan B. Morrison, Washington, D.C., were on the brief, for amicus curiae, Public Citizen, urging affirmance.

Donald J. Simon, Washington, D.C., Cass Sunstein, Laurence H. Tribe, Cambridge, Mass., Archibald Cox and Philip B. Heyman, Washington, D.C., were on the brief, for amicus curiae, Common Cause, urging affirmance.

Rex E. Lee, Irvin B. Nathan, Washington, D.C., and Robert MacCrate, New York City, were on the brief, for amicus curiae, American Bar Ass'n, urging affirmance.

Lawrence E. Walsh, Independent Counsel, Paul L. Friedman, Guy Miller Struve and James E. McCollum, Jr., Associate Counsel, Washington, D.C., were on the brief, for amicus curiae, Independent Counsel Lawrence E. Walsh, urging affirmance.

Michael Davidson, Senate Legal Counsel, Ken U. Benjamin, Jr., Deputy Senate Legal Counsel, Morgan J. Frankel and Susan B. Fine, Asst. Senate Legal Counsel, U.S. Senate, Washington, D.C., were on the brief, for amicus curiae, U.S. Senate, urging affirmance.

Before RUTH BADER GINSBURG, SILBERMAN, and WILLIAMS, Circuit Judges.

SILBERMAN, Circuit Judge:

Three former government officials, Theodore B. Olson, previously Assistant Attorney General, Office of Legal Counsel, Carol E. Dinkins, previously Assistant Attorney General, Lands Division,[1] and Edward C. Schmults, previously Deputy Attorney General of the United States, appeal from a district court judgment rejecting their challenge to the authority of a federal prosecutor, the independent counsel, appointed under the provisions of the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591–598 (1982 & Supp. III) (the "Act"), to issue subpoenas compelling the testimony of these appellants before a grand jury concerning actions taken while they served in their governmental positions.[2] Appellants contend that the Act on which the independent counsel's authority is based is unconstitutional. We agree with appellants, and so we reverse the district court order holding appellants in contempt for failing to answer the subpoenas.

## I.

The criminal investigation involved in this case arose out of a heated dispute over document production between the Executive and Legislative Branches. In September 1982, two subcommittees of the House of Representatives requested the Environmental Protection Agency ("EPA") to provide them with internal EPA documents pertaining to the clean-up of hazardous waste sites. The House was concerned that the Reagan administration was expending funds so as to aid Republican candidates in the 1982 Senate elections. At the direction of the Department of Justice, the EPA made some documents available but refused to grant access to enforcement-sensitive documents on the grounds that their release would interfere with law enforcement efforts. After negotiations between the two branches failed, the two subcommittees issued subpoenas to the Ad-

ministrator of the EPA. The Administrator, invoking executive privilege by order of the President, refused to comply with the subpoenas. The House of Representatives responded by citing the Administrator for contempt, at which point the Administrator and the United States together filed a lawsuit against the House. Eventually, by March of 1983, the Administrator and the two subcommittees reached agreement on document production.

Ancillary to this running battle between Congress and the Executive, a subcommittee of the House Judiciary Committee began an investigation into the Justice Department's role in the EPA document controversy. On March 10, 1983, as part of that investigation, the subcommittee heard testimony from Assistant Attorney General Olson. At the completion of the investigation, the Judiciary Committee issued a lengthy report, over the vigorous dissent of the Republican members of the Committee, containing charges of serious wrongdoing by senior Department of Justice officials. REPORT ON INVESTIGATION OF THE ROLE OF THE DEPARTMENT OF JUSTICE IN THE WITHHOLDING OF ENVIRONMENTAL PROTECTION AGENCY DOCUMENTS FROM CONGRESS IN 1982–83, H.R.REP. No. 435, 99th Cong., 1st Sess. (1985).

Based on this report, in December 1985 the Judiciary Committee requested the Attorney General to conduct a preliminary investigation, as required by the independent counsel provisions of the Ethics in Government Act, into possible violations of federal law on the part of several administration officials who appeared before the Judiciary Committee, including former Assistant Attorney General Olson. The Act applies to the President and Vice President, the Director and Deputy Director of the Central Intelligence Agency, cabinet-level officials, various other officials in the Department of Justice and in the Executive Office of the President, and high level offi-

---

**1.** Carol Dinkins subsequently held the post of Deputy Attorney General of the United States.

**2.** The names of appellants were previously under seal. Their names, already well publicized, and certain facts regarding the background of

the investigation are revealed because we think those facts relevant to our opinion. The case's significance, in any event, makes it impossible to maintain secrecy. *See* FED.R.CRIM.P. 6(e)(3)(C)(i).

cials on the President's campaign committee. 28 U.S.C. § 591.

Under the Act, the Attorney General must begin an investigation, to be completed within ninety days, if he finds the information of wrongdoing given him "sufficient to constitute grounds to investigate." 28 U.S.C. § 592. During this preliminary investigation, the Attorney General's investigative resources are severely limited; he has "no authority to convene grand juries, plea bargain, grant immunity, or issue subpoenas." *Id.* If the Attorney General "finds reasonable grounds to believe that further investigation is warranted," then he must refer the matter to the Independent Counsel Division of the United States Court of Appeals for the District of Columbia Circuit (the "Special Court").[3] Thus, at this initial investigatory stage, the Attorney General's role is quite restricted—he is directed to decide not if prosecution is probably warranted but merely whether more investigation is needed, and in making this limited determination he is denied the usual truth-finding tools of a prosecutor.

On April 10, 1986 the Attorney General asked the Special Court to appoint an independent counsel to investigate

> [w]hether the conduct of former Assistant Attorney General Theodore Olson in giving testimony at a hearing of the Subcommittee on Monopolies and Commercial Law of the House Judiciary Committee on March 10, 1983, and later revising that testimony, regarding the completeness of the Office of Legal Counsel's response to the Judiciary Committee's request for OLC documents, and regarding his knowledge of EPA's willingness to turn over certain disputed documents to Congress, violated 18 U.S.C. § 1505, § 1001, or any other provision of federal criminal law.

Report of the Attorney General Pursuant to 28 U.S.C. § 592(c) (1) Regarding Allegations Against Department of Justice Offi-

cials in United States House Judiciary Committee Report ("Report of Attorney General") at 2–3 (footnote omitted). The Attorney General also requested that the independent counsel have authority to investigate "any other matter related to that allegation." *Id.* at 11.

The Judiciary Committee's request for an investigation also pointed to possible wrongdoing by Edward Schmults and Carol Dinkins. The Attorney General concluded, however, that there were no reasonable grounds to believe that further investigation of these allegations was warranted and so did not refer these matters to the independent counsel. *Id.* at 22, 47–48. In deciding whether to refer a matter to the independent counsel, the Attorney General is required by § 592(c)(1) of the Act to "comply with the written or other established policies of the Department of Justice with respect to the enforcement of criminal laws." The decision concerning Schmults and Dinkins was made in accordance with a Department of Justice policy that criminal prosecutions not be commenced "if there is no reasonable prospect that an unbiased jury would return a criminal conviction." Report of the Attorney General at 26.

In April of 1986 the Special Court appointed James McKay as independent counsel. Shortly thereafter, upon McKay's resignation, the Special Court appointed Alexia Morrison to replace him. In November 1986 Morrison applied to the Attorney General, pursuant to 28 U.S.C. § 594(e),[4] for expanded jurisdiction to probe charges against Edward Schmults and Carol Dinkins. In particular, the independent counsel wished to investigate "whether Mr. Olson's testimony was part of a larger, concerted plan, including Mr. Schmults, Ms. Dinkins, or others, to obstruct or impede the Committee's investigation ... possibly in violation of federal criminal law." Letter from Alexia Morrison to Edwin Meese

---

**3.** The Special Court is composed of three judges designated by the Chief Justice of the United States. One member of the Special Court must be a judge of the United States Court of Appeals for the District of Columbia Circuit. 28 U.S.C. § 49.

**4.** 28 U.S.C. § 594(e) provides that an "independent counsel may ask the Attorney General or the division of the court to refer matters related to the independent counsel's prosecutorial jurisdiction."

III at 3 (Nov. 14, 1986). The Attorney General refused this request because his initial investigation of the Judiciary Committee's allegations had "found no reasonable grounds to believe that further investigation or prosecution of these allegations is warranted." Letter from Arnold I. Burns, Deputy Attorney General, to Alexia Morrison at 2 (Dec. 17, 1986). The letter of refusal specifically mentioned that the allegations of a criminal conspiracy among Schmults, Dinkins, and Olson had been investigated and that no reasonable grounds for continuing that investigation had been found. *Id.*

Faced with the Attorney General's refusal to broaden her authority, the independent counsel applied to the Special Court, pursuant to 28 U.S.C. § 594(e), for added jurisdiction to investigate Schmults and Dinkins. The Special Court denied this request, on grounds that it lacked the authority "to refer allegations to the Independent Counsel when the Attorney General has specifically determined, under § 592(b)(1) that those allegations should not be pursued." *In re Olson,* 818 F.2d 34, 47 (D.C. Cir.Indep.Couns.Div.1987). However, the Special Court found that "authority to investigate allegations and evidence that Theodore Olson was engaged in an unlawful conspiracy with others" was "implicit" in the Special Court's initial grant of jurisdiction to the independent counsel. *Id.* Therefore, the Special Court held that the independent counsel had the power to investigate " 'whether Mr. Olson's testimony was part of a larger, concerted plan, including Mr. Schmults, Ms. Dinkins, *or others,* to obstruct or impede the Committee's investigation.' " *Id.* at 48 (quoting letter

from Alexia Morrison to Edwin Meese III at 3 (Nov. 14, 1986).[5]

Soon after the release of the Special Court's opinion, the independent counsel subpoenaed Edward Schmults, Theodore Olson, and Carol Dinkins to appear before a grand jury. The three appellants moved to quash the subpoenas on grounds that the independent counsel provisions of the Act were unconstitutional. On July 20, the district court upheld the constitutionality of the independent counsel provisions. *In re Sealed Case,* No. 87–0197 (D.D.C.1987) (mem). In order to pursue their challenge to the Act on appeal, the appellants refused to appear before the grand jury and were held in contempt pursuant to 28 U.S.C. § 1826(a). Appellants renew their challenge to the constitutionality of the Act on appeal of the order holding them in contempt.[6]

The appellants contend that the Act's appointment provision, its restriction on removal, and its vesting of supervisory powers in an Article III court are unconstitutional. They argue that placing the appointment of the independent counsel in the Special Court violates the appointments clause, the doctrine of separation of powers, and Article III of the Constitution. And they claim that restrictions on the President's power to supervise and remove the independent counsel interfere with the President's ability to execute the law. More broadly, appellants assert that the Act as a whole jettisons traditional adherence to constitutional doctrines of separation of powers and a unitary executive, and in so doing, seriously weakens constitutional structures that serve to protect individual liberty. For the reasons set forth below,

---

5. The Special Court indicated that "[i]f further investigation by the Independent Counsel turns up credible evidence of federal criminal violations by others," the independent counsel could renew her request to the Attorney General for authority to prosecute Schmults and Dinkins. *In re Olson,* 818 F.2d at 48. Thus the Special Court, by authorizing additional investigation of Schmults and Dinkins, kept alive the possibility of their prosecution.

6. The independent counsel expresses doubt in this court as to the appropriateness of review of appellants' constitutional claims prior to convic-

tion. We have previously decided in an unrelated case that a witness who has been subpoenaed by an independent counsel may obtain judicial review of the constitutionality of the Act if held in contempt. *See In re Sealed Case,* 827 F.2d 776 (D.C.Cir.1987). In any event, as the independent counsel did not question the propriety of the district court's consideration of the constitutional claim, she has lost the opportunity to do so on appeal. *See District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084–85 (D.C. Cir.1984). We do not think this is a jurisdictional issue.

we agree with appellants that the Act is unconstitutional.

## II.

■ Two hundred years after the adoption of the United States Constitution the federal courts are, essentially for the first time, required to construe closely the appointments clause of Article II. Appellants claim that the independent counsel is not an "inferior" officer as that term is used in the clause and therefore she may be appointed only through nomination by the President and confirmation by the Senate. Since all parties agree that the independent counsel is an officer of the United States and not an employee, her appointment by the Special Division of this court would, if appellants are correct in their interpretation of the clause, be unconstitutional.

The appointments clause provides that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S.CONST. art. II, § 2, cl. 2.

Two classes of officers of the United States are contemplated by the clause, those who *must* be appointed by the President with the advice and consent of the Senate, whom we shall refer to as principal officers, and inferior officers, who, if authorized by legislation, can be appointed by heads of departments, courts of law, or the President alone. The independent counsel, supported by various amici, contends that the only officers who must be appointed

with the advice and consent of the Senate and not otherwise are Supreme Court Judges, ambassadors, other public ministers, and consuls. All other officers of the United States, they argue, including department heads and federal judges, are inferior officers who could, if legislation authorized it, be appointed in accordance with the second part of the clause.

We think that this is an unnatural reading of the clause, for the first part of the clause insists that not only Judges and Ambassadors must be appointed with the advice and consent of the Senate, but also all other officers of the United States *"whose Appointments are not herein otherwise provided for."* "Herein" must refer to at least the clause itself and thus perforce includes inferior officers who may be appointed in accordance with the second portion of the clause.[7] It follows that the term "all other Officers of the United States" encompasses more than the inferior officers described in the second part of the clause because that part is phrased as an exception to the "all other Officers" language. Otherwise—under the independent counsel's interpretation—"all other Officers" are, each and every one, inferior officers and thus the phrase requiring presidential appointment with the advice and consent of the Senate for "all other Officers" not "otherwise provided for" is utterly without meaning. Among the officers who must be appointed by the President with the advice and consent of the Senate it seems most obvious to include the heads of departments and federal judges since they are specifically empowered (along with the President to whom they are linked in the clause) to appoint inferior officers. In fact, as we discuss further in Part III, the purpose of the excepting clause was to ensure that courts of law and heads of departments could appoint officers inferior to them; it was certainly not meant to allow the appointment of department heads without the advice and consent of the Senate.[8]

---

7. The only other places in the Constitution where appointment is provided for are Art. I, § 3, cl. 2 (appointment of Senators by state executives to fill vacancies); Art. I, § 8, cl. 16

(reserving the appointment of officers of the militia to the states).

8. The First Congress concluded that the heads of departments were principal officers. *See* 1

A single clause of the Constitution should not be interpreted inconsistently with the remainder of the Constitution. *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 332, 84 S.Ct. 1293, 1298, 12 L.Ed.2d 350 (1964). Central to the government instituted by the Constitution are the doctrines of separation of powers and a unitary executive, which we discuss at length in Part III, and yet the independent counsel interprets the appointments clause as if those doctrines were non-existent. Understanding that the President could not fulfill his constitutional role by himself, the Framers envisioned that the Executive Branch would be divided into departments whose officers would be appointed by the President and who could be removed by Congress only through the impeachment process. *See Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). It strains belief that in the face of this scheme the Framers would insert a clause into the Constitution that would allow Congress, the branch most feared by the Framers, *see* THE FEDERALIST No. 48 (J. Madison); *see also Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3189, 92 L.Ed.2d 583 (1986), to abrogate the President's power to appoint Executive Branch officers.

Not only does the independent counsel's interpretation seem inconsistent with the language of the clause and the remainder of the Constitution, it makes, to our view, no functional sense. "The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics," *Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 686, 46 L.Ed.2d 659 (1976), and therefore would not have drafted an appointments clause that had a capricious

meaning. Yet appellee's suggested interpretation has, we are forced to conclude, just that capricious character. If department heads and federal judges (other than Supreme Court Justices) are inferior officers, then it presumably follows that any one department head could be authorized, consistent with the Constitution, to appoint all of the rest and all the federal judges to boot.[9] And of course, a federal court could instead be given the reciprocal power to appoint all department heads and all the rest of the federal judges. To be sure, it would not have been illogical for the Framers to leave to subsequent legislation *all* procedures for appointment of officers or to limit those appointments only by the second portion of the appointments clause (requiring appointment by the President, courts of law, or department heads). But having specially provided that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... all other Officers of the United States, whose Appointments are not herein otherwise provided for," it is implausible to suggest that the Framers intended that no officers, even heads of departments, had to be appointed in this fashion. In fact, the statutes enacted by the First Congress creating the various executive departments are silent regarding the mode of appointment of the principal officers of those departments, thereby suggesting that the legislators believed that they had no choice in the matter because they understood the Constitution to require that principal officers be appointed by the President with the advice and consent of the Senate and therefore it was not necessary to provide for appointment in the statute itself.[10]

ANNALS OF CONG., 455–56 (J. Gales ed. 1789) (Rep. White); *id.* at 509 (Rep. Smith); *id.* at 518 (Rep. White); 2 J. STORY, COMMENTARIES ON THE CONSTITUTION 362 n. 1 (5th ed. 1891) ("[w]hether the heads of departments are inferior officers, in the sense of the Constitution, was much discussed.... The result of the debate seems to have been that they were not."). Substantial weight should be given to constitutional interpretations by the First Congress. *Marsh v. Chambers*, 463 U.S. 783, 790, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

**9.** As we show in Part III, the excepting clause cannot, consistent with the rest of the Constitution and the intent of the Framers, be read to allow officers in one branch to appoint officers of another branch. However, the independent counsel and various amici argue that there are no limits on "inter-branch" appointments, and thus their theory of the clause would allow such strange results.

**10.** 1 Stat. 28–29 (1789) (Department of Foreign Affairs); *id.* at 49–50 (Department of War); *id.* at 65–67 (Treasury Department).

The independent counsel's reading is particularly incongruous because the first part of the clause requires that senior diplomats be appointed by and with the consent of the Senate. The Framers certainly expected that the new government would be organized into departments, and the most obvious prospective department in their minds (in fact the first one created), must have been the Department of Foreign Affairs.[11] The Framers could not have been more concerned that the Senate be a check on a presidential appointment of an ambassador, or a consul, than that it be a check on the appointment of the Secretary of the Department of Foreign Affairs, to whom, in all likelihood, the ambassadors or consuls would report.[12] Through a procedure requiring the participation of the President and the Senate, the Framers had as their object the creation of a role for both branches in choosing officers who were to be entrusted with discretion in carrying out the execution of the laws. Appellee's suggestion that this object extended only to ambassadors, public ministers, consuls, and Judges of the Supreme Court is quite unpersuasive.

Even though the Framers surely contemplated that ambassadors and consuls would be subordinate to the head of the Department of Foreign Affairs, we can readily understand why these officers nevertheless were thought of as principal rather than inferior. In the eighteenth century, a minister posted abroad had to exercise a good deal of independent judgment—certainly more than is the case today—simply because communications were so much slower than now.[13] Similarly, lower federal judges who, according to our reading of the clause, are principal officers, although of course subordinate in a sense to the Supreme Court, are not subject to personal supervision. The Supreme Court, in the exercise of its power to affirm, reverse, or modify, supervises cases—not judges who, appointed for life, are in a supervisory sense not inferior to anyone.[14]

The only judicial support the independent counsel musters for her construction of the appointments clause is *United States v. Germaine*, 99 U.S. (9 Otto) 508, 25 L.Ed. 482 (1878). In that case, the Supreme Court held that a part-time surgeon appointed by the Commissioner of Pensions was not an officer of the United States because, *inter alia*, the Commissioner of Pensions was not a department head. In preliminary discussion, the Court described inferior officers as inferior to those "specially mentioned" in the appointments clause, *id.* 99 U.S. at 510, and the independent counsel asserts that the only officers "specially mentioned" are Judges of the Supreme Court, ambassadors, etc. We disagree. There is no reason to infer that by "specially mentioned," the Court meant to

---

**11.** Earlier drafts of the Constitution actually listed the prospective departments by name. 1 The Records of the Federal Convention of 1787, at 292 (M. Farrand ed. 1911) ("M. Farrand"). The Constitution itself refers to departments in Art. I, § 8., cl. 18 and Art. II, § 2, cls. 1 and 2. The Department of Foreign Affairs was created on July 27, 1789. 1 Stat. 29.

**12.** The Act creating the Department of Foreign Affairs (subsequently the State Department) provides that the Secretary of the Department "shall perform and execute such duties ... relative to correspondences, commissions or *instructions* to or with public ministers or consuls." 1 Stat. 29 (1789) (emphasis added).

**13.** In addition, at that time the President was thought to have the power, derived from the law of nations, to appoint ambassadors and consuls without these offices' being created by Congress. It was not until 1855 that Congress provided by statute for specific grades and salaries for diplomatic officers. The Constitution of the United States of America 445–46 (E. Corwin ed. 1953). Certainly an ambassador must be appointed by the President and confirmed by the Senate, but this leaves open the question of what defines an ambassadorial position, and whether, for example, Congress could require that any assistant to the President who negotiates a treaty must be confirmed by the Senate. *See id.* at 447–48. Such questions are not presented by this case, however.

**14.** Although both the Supreme Court and the circuit courts promulgate rules of evidence and procedure, particularly for criminal cases, on the authority of a general supervisory power, *see McNabb v. United States*, 318 U.S. 332, 340–41, 63 S.Ct. 608, 612–13, 87 L.Ed. 819 (1943), this power does not involve the supervision of judges. *See Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037, 1053 (7th Cir.1984) (Posner, J., dissenting).

exclude the officers "specially mentioned" in the second part of the clause, *i.e.*, the President, federal judges, and department heads. *See* E. CORWIN, THE PRESIDENT, 411–12 n. 28 (5th rev. ed. 1984) (" '[T]he President alone,' 'the courts of law,' and 'the heads of departments' are also 'specially mentioned.' "). Indeed, in concluding that "inferior" commissioners and bureau chiefs were not department heads authorized by the Constitution to appoint inferior officers, the Court described them as "mere aids and subordinates of the heads of the departments," *Germaine*, 99 U.S. at 511, thus recognizing that the word "inferior" in the appointments clause has a functional rather than a merely ceremonial meaning. See also *Collins v. United States*, 14 Ct. Cl. 568, 574 (1879):

> The word inferior is not here used in that vague, indefinite, and quite inaccurate sense which has been suggested—the sense of petty or unimportant; but it means subordinate or inferior to those officers in whom respectively the power of appointment may be vested—the President, the courts of law, and the heads of departments.

Moreover, the Court in *Germaine* included department heads among the principal officers of whom the President, in the same section of the Constitution, is authorized to require an opinion in writing. Since the Court regarded the department heads as principal officers, it could not have meant department heads to be regarded at the same time as inferior officers within the meaning of the appointments clause.

■ We therefore reject the independent counsel's construction of the appointments clause, but we are still confronted with the question whether the independent counsel is an inferior officer—for under the clause, only if she is an inferior officer can she be appointed without action by the President and without the advice and consent of the Senate. The answer to that question de-

pends, it seems to us, given the functional interpretation of the clause suggested by the Supreme Court in *Germaine*, on whether the independent counsel properly can be thought subordinate to a principal officer. Is she in the exercise of her duties, in other words, a "mere aid[ ] and subordinate of the head of [a] department[ ]" or does she instead employ such independence of authority as to place her on the principal officer side of the appointments clause dichotomy?

The independent counsel relies almost entirely on her basic construction of the clause and only briefly makes what could be construed as the alternative argument that even under our reading of the clause she is nonetheless an inferior officer. She contends that since the Attorney General can appoint, and has appointed, independent counsel with precisely the authority and duties that she enjoys by virtue of her court appointment and because such authority has been sustained by this court, *In re Sealed Case*, 829 F.2d 50 (D.C.Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988), she must be an inferior officer.[15] This is so because the Attorney General may constitutionally appoint only inferior officers, and, according to the independent counsel, the constitutional status of an officer cannot change merely because she is appointed by a special division of a court rather than the Attorney General. The independent counsel, however, ignores the factor in our prior opinion that was decisive to our determination that the independent counsel was "inferior." His powers were conferred by regulation promulgated by the Attorney General and could be terminated by repeal of that regulation. Not only had the Attorney General appointed the independent counsel, he could, by revoking or modifying the regulation "at any time," *id.* at 56, have modified the independent counsel's duties or terminated the office.[16] Under such circumstances the

---

**15.** After litigation commenced in another case challenging the constitutionality of the Ethics in Government Act, the Attorney General offered all existing independent counsel, including Morrison, a parallel Justice Department appointment. *See* 52 Fed.Reg. 7270 (1987); *In re*

*Sealed Case*, 829 F.2d at 52–53. This independent counsel declined the parallel appointment.

**16.** The dissent suggests that such a revocation would be "practically remote," Dissent at 32 n. 38, but that was not the tenor of our prior

independent counsel was, as were prior "independent" special prosecutors appointed by the Attorney General, clearly an inferior officer.[17]

But that is not this case—this independent counsel has refused to accept the Attorney General's appointment. She cannot now base an argument for constitutional inferiority on the Attorney General's appointment power that she has explicitly rejected. Nor, in our view, can she predicate the Attorney General's superior status, as she suggests, on the Attorney General's statutory removal power which she describes as "exclusive." As we discuss later in our opinion, the Attorney General has essentially only the authority to petition the Special Court to authorize the removal of an independent counsel. The Attorney General therefore cannot be thought of as the independent counsel's constitutional superior. Under the statute, the Attorney General has the effective power neither to appoint her, to define, circumscribe, or supervise her duties, nor to remove her or terminate her office. We need not consider whether the Special Court, which has a good deal more authority under the statute vis-a-vis the independent counsel, is her constitutional superior since neither the independent counsel nor for that matter any amicus contends that the court fulfills that role.[18]

The independent counsel does, however, at least suggest that one can be an inferior officer within the meaning of the appointments clause without having *any* hierarchical superior. In *Ex parte Siebold,* 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1880); upon which the independent counsel relies for this proposition, the Supreme Court upheld the constitutionality of a statute giving the courts of law the responsibility for appointing election commissioners. *Id.,* 100 U.S. at 379–82. The statute itself did not specify, as the independent counsel correctly maintains, who, if anyone, was the constitutional superior of the commissioners. That issue, however, was not discussed in the Court's opinion because it was not contended that the commissioners were principal officers. In truth, the duties of those election commissioners were relatively modest; they were charged with the observation of federal congressional elections and the reporting of improprieties to Congress—which, of course, has the constitutional responsibility to "[j]udge ... the Elections, Returns and Qualifications of its own Members." U.S.CONST. art. I, § 5, cl. 1.

As the Court observed, the commissioners were not clearly within any of the three branches (which is in large part why the Court held their appointment by a court constitutional, *see* discussion *infra* pp. 493–94). They were certainly not, as is the independent counsel, an indisputable part of the Executive Branch. The commissioners seem to us actually to have been subordinates of Congress, but, in any event, since the issue was not even presented, the

opinion. *Cf. Bowsher v. Synar,* 106 S.Ct. 3181, 3189 n. 5. Nor did we there determine that the independent counsel was inferior because of the nature of his duties—it was the power of the Attorney General to rescind the regulation and thereby presumably control or abolish his duties that was decisive.

**17.** The Office of the Special Prosecutor during the Watergate era is not analogous to the independent counsel post. As the Supreme Court stated in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), President Nixon, through the Attorney General, could have removed the Special Prosecutor at any time. *Id.* at 696, 94 S.Ct. at 3101.

Similarly, the statute under which courts may make temporary appointments of United States Attorneys, which was upheld against a constitutional challenge in *United States v. Solomon,*

216 F.Supp. 835 (S.D.N.Y.1963), did not create an office insulated from the normal supervisory and removal powers of the Executive Branch. The court in *Solomon* said that "the exercise of the appointive power by the judiciary in no wise binds the executive. The statute clearly contemplates that the executive branch is free to choose another United States Attorney at any time, the judicial appointment notwithstanding." *Id.* at 842–43.

**18.** Any claim that the Special Court is the constitutional superior of the independent counsel would undermine much of the independent counsel's defense of the statute and would place into even starker relief the constitutional anomaly of a court of law appointing and supervising an executive officer. *But see* Dissent at 535 n. 47.

Court's opinion is hardly authority for the independent counsel's proposition. The Supreme Court has not, moreover, had any occasion to decide whether members of independent regulatory agencies or commissions who are also not clearly within any of the three branches, are principal or inferior officers. In *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976), the Court described the election commissioners involved in that case, who exercised a good deal more authority than the commissioners in *Siebold*, as "*at the very least ... inferior officers*" (emphasis added), thus suggesting that they might be principal officers. It is unnecessary, however, for us to decide this more difficult question the Supreme Court reserved in *Buckley v. Valeo*. Whatever the status of commissioners or members of independent agencies, we think the independent counsel's authority is so broad as to compel the conclusion that she is a principal officer and therefore her appointment by the Special Court is unconstitutional. After all, the independent counsel's authority is—at least with respect to any matter within her jurisdiction—broader even than the Attorney General's. As has been argued in this case and previous ones before our court challenging the constitutionality of the statute, *see In re Sealed Case*, 829 F.2d 50 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988), the independent counsel has authority unchecked by the President himself to decide that an investigation shall continue and that a prosecution shall be initiated. She must give only that consideration that she deems appropriate to all those factors relevant to prosecution—including the foreign relations of the United States—that we discuss in Part IV.

In its opinion upholding the constitutionality of the independent counsel statute, the district court determined that the independent counsel was an inferior officer because " 'he is appointed for a single task to serve for a temporary limited period.' " *In*

re *Sealed* Case, 665 F.Supp. 56, 58 (D.D.C. 1987) (quoting *In re Olson*, 818 F.2d 34, 44 (D.C.Cir.Indep.Couns.Div.1987)). The district court relied upon *United States v. Eaton*, 169 U.S. 331, 343, 18 S.Ct. 374, 379, 42 L.Ed. 767 (1898), in which the Supreme Court stated that "[b]ecause the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official." In *Eaton*, the Supreme Court considered whether Congress had the "power to vest in the President [alone] the appointment of a subordinate officer called a vice-consul" who would temporarily carry out the duties of a consul. *Id.* The Court upheld this mode of appointment, because a contrary ruling would have voided any delegation of the duties of a superior officer to an inferior, no matter how minor or temporary the delegation might be. *Id.* Unlike the statute considered in *Eaton*, the Ethics in Government Act does not temporarily delegate the Attorney General's authority to investigate and prosecute criminal wrongdoing by high government officials to an inferior official. Instead, the Act removes that authority from the Attorney General altogether and places it entirely in the independent counsel. *See* 28 U.S. C. § 597. The independent counsel's authority over the investigation is not temporary; it is coterminous with the investigation itself. Hence, the independent counsel is not analogous to an inferior officer who temporarily carries out the tasks of a superior while the superior is absent or disabled.

That the independent counsel's appointment expires when her task is completed seems to us irrelevant. Ambassadors are often appointed in accordance with the appointments clause for discrete negotiations and the Framers, experienced as they were with foreign affairs, contemplated just that eventuality.[19] This independent counsel, moreover, not unlike others, has served for

---

19. The Framers distinguished between diplomatic agents who would carry out continuing assignments at diplomatic posts and ambassadors who would be commissioned to negotiate

particular treaties. *See, e.g.*, THE FEDERALIST No. 42, at 279–80 (J. Madison) (J. Cooke ed. 1961); 2 J. STORY, *supra* note 8, at 351.

almost two years, which is as long as many cabinet officers. Of course a given department remains in existence after the cabinet officer resigns, but in the same sense the independent counsel role seems constitutionally more substantial than any one incumbent; a number have been appointed under the statute and there are several in operation at the present. We think that the appointments clause necessarily comprehends, in distinguishing principal from inferior officers, the depth and breadth of the authority exercised, not merely the contemplated tenure of the job. The magnitude of the task, not its expected period of performance, is constitutionally determinative.

Although it could well be argued that independent counsel, who often supervise more employees than cabinet departments once employed, are themselves "heads of departments," it is also unnecessary for us to determine the reach of that phrase. Suffice it for the case for us to hold as we do that the independent counsel is not an inferior officer and thus falls at minimum within that category of the appointments clause of "all other Officers of the United States, whose Appointments are not herein otherwise provided for." As such, her appointment is constitutionally invalid.[20]

### III.

The Act's failure to comply with the appointments clause is sufficient to render it unconstitutional. We decide appellants' other constitutional claims, however, so that if this decision is appealed, and the Supreme Court decides that these additional claims must be reached, it will not have to "either proceed without the usual benefit of a lower-court opinion or else delay final disposition by remanding for that purpose." *Synar v. United States*, 626 F.Supp. 1374, 1383 (D.D.C.), *aff'd*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). The appellants claim, and we agree, that even if the independent counsel were an inferior officer, and so did not have to be appointed by the President with the advice and consent of the Senate, the Act would violate the Constitution because it impermissibly interferes with the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

Authority to prosecute an individual is that government power which most threatens personal liberty, for a prosecutor "has the power to employ the full machinery of the state in scrutinizing any given individual. Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life." *Young v. United States ex rel. Vuitton et Fils S.A.*, — U.S. —, 107 S.Ct. 2124, 2141, 95 L.Ed.2d 740 (1987). The Framers of the Constitution were justly fearful of this power. They had recently witnessed the crime of sedition used as a tool of an oppressive government to retain power unjustly and to persecute its enemies, and English experience with the Star Chamber further shaped their views on criminal law and criminal process. *See Ullmann v. United States*, 350 U.S. 422, 427–28, 76 S.Ct. 497, 500–01, 100 L.Ed. 511 (1956). Counsel for one appellant captured this

---

**20.** The dissent maintains that we should defer to Congress' interpretation of the Constitution, as to whether an officer is inferior or principal (as well as to, among other matters, how independent the independent counsel should be). *See* Dissent at 532. But no authority is cited for this proposition and we do not believe we can treat Congress' constitutional interpretation as we would an agency's construction of its governing legislation—that is not our role. "To allow a simple majority of Congress to have final say on matters of constitutional interpretation is … fundamentally out of keeping with the constitutional structure." *Oregon v. Mitchell*, 400 U.S. 112, 205, 91 S.Ct. 260, 305, 27 L.Ed.2d 272 (1970) (Harlan, J., concurring and dissenting). "It is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803). "The Court and the profession have treated the judicial duty as requiring independent judgment, not deference, when the decisive issue turns on the meaning of the constitutional text, and that specific conception of the judicial duty is now deeply engrained in our constitutional order." Monaghan, *Marbury and the Administrative State*, 83 COLUM.L.REV. 1, 9 (1983) (footnotes omitted); *see Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 61–62, 102 S.Ct. 2858, 2866, 73 L.Ed.2d 598 (1982).

point pungently at oral argument when he said that our forefathers "understood prison very well and they understood the monarch and the power of an unaccountable monarch to put people in prison."

The Constitution therefore carefully distributes the various responsibilities for criminal prosecution among each of the three branches, so that citizens may not be endangered by one branch acting alone. Madison referred to the doctrine of separation of powers as an "essential precaution in favor of liberty," THE FEDERALIST No. 47, at 323 (J. Cooke ed. 1961), and it is part of "our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government." *United States v. United States District Court*, 407 U.S. 297, 317, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972). Federal criminal law can be enacted only by Congress. This innovation marks a major shift from prior practice, which countenanced a common law of crime created by the same judges who tried the cases. *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). Congress' role in the criminal law was carefully confined to this initial stage of law creation. Congress is, accordingly, explicitly forbidden to pass bills of attainder, one of the few positive prohibitions on congressional power contained in Article I. *See United States v. Brown*, 381 U.S. 437, 442, 85 S.Ct. 1707, 1711–12, 14 L.Ed.2d 484 (1965) ("the Bill of Attainder Clause was intended not as a narrow, technical ... prohibition, but rather as an implementation of the separation

of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature"). And the power of Congress to impeach officers of the United States is also limited—the penalty "shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." U.S. CONST. art. I, § 3, cl. 7. Even through impeachment then, Congress is powerless to deprive any individual of liberty.

■ Next the Constitution vests the power to initiate a criminal prosecution exclusively in the Executive Branch; this power is encompassed within the Executive's power to "take Care that the Laws be faithfully executed." The Executive has "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); *United States v. Cox*, 342 F.2d 167, 171 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws[.]" *Community for Creative Non–Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C.Cir. 1986).[21]

The Framers provided for a unitary executive to ensure that the branch wielding the power to enforce the law would be accountable to the people. "The idea of a 'plural executive,' or a President with a council of state, was considered and reject-

---

21. The independent counsel cites *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C.Cir.1974), and *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), as authority for the proposition that the President may not refuse to execute a valid law, and thus, that law enforcement is not an exclusive Executive Branch prerogative. These two cases hold that a court may issue a writ of mandamus to an executive officer, including the President, to require that officer to perform a purely ministerial duty. A ministerial duty is defined as "'one in respect to which nothing is left to discretion.'" *National Treasury Employees Union*, 492 F.2d at 607–08 (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498, 18

L.Ed. 437 (1867)). Such a duty is distinguished from discretionary or policymaking functions, which are subject to presidential guidance. "There are certain political duties imposed upon many officers in the executive department, the discharge of which is under the direction of the president." *Kendall*, 37 U.S. at 610. By "politics" we understand the Supreme Court to refer to what we now call policy, not partisan politics. *See* discussion *infra* p. 497. The independent counsel surely does not mean to suggest that the process whereby a prosecutor determines whether or not to bring criminal charges against a defendant is a mere ministerial act not involving the weighing of policy questions.

ed by the Constitutional Convention. Instead the Founders chose to risk the potential for tyranny inherent in placing power in one person, in order to gain the advantages of accountability fixed on a single source." *Sierra Club v. Costle,* 657 F.2d 298, 405 (D.C.Cir.1981) (footnote omitted).[22] Under the Constitution, the President, as the head of the Executive Branch, is the person ultimately responsible for a decision to initiate a criminal prosecution. *See Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985); *United States v. Cox,* 342 F.2d at 171. If that decision is contrary to the mores and customs of the community, the community has a visible target for its grievances. No anonymous directorates hold sway here, no impenetrable bureaucracies or commissions obscure the identity of the responsible official; the chain of command leads directly upward to the President. As Hamilton wrote, "it is far more safe there should be a single object for the jealousy and watchfulness of the people; and in a word that all multiplication of the executive is rather dangerous than friendly to liberty." THE FEDERALIST No. 70, at 479 (J. Cooke ed. 1961); *see also Myers v. United States,* 272 U.S. 52, 131–34, 47 S.Ct. 21, 30–31, 71 L.Ed. 160 (1926). Not merely an abstract idea of political theory, the President's accountability is a hallmark of our democracy—perhaps best put in President Truman's gritty aphorism "The buck stops here." For no federal government function is it more vital to the protection of individual liberty that ultimately the buck stop with an accountable official—the President—than in the prosecution of criminal laws.

That the government prove its case in a jury trial before a neutral and disinterested court, insulated with extraordinary tenure protection from the other two branches of government and shielded from popular pressure, is the final safeguard contained in the original Constitution upon the federal government's power to prosecute the criminal laws. *See Commodity Futures*

*Trading Comm'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986). The constitutional scheme is as simple as it is complete—Congress passes the criminal law in the first instance, the President enforces the law, and individual cases are tried before a neutral judiciary involved in neither the creation nor the execution of that law. *See Young v. United States ex rel. Vuitton et Fils S.A.,* —— U.S. ——, 107 S.Ct. 2124, 2133–34 & n. 10, 95 L.Ed.2d 740 (1987). The Ethics in Government Act, it seems to us, deliberately departs from this framework in both its particular provisions and in its general purpose, which is to authorize an officer not accountable to any elected official to prosecute crimes. It may well be that the constitutional framework is awkward or burdensome in particular cases, but, under this system, efficiency is knowingly sacrificed in various ways so that liberty may be protected. Therefore, a law whose purpose is to ensure a more efficient or more trustworthy means for the state to prosecute crime than that contemplated by the Constitution comes into this court with a heavy burden. *See Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3193–94, 92 L.Ed.2d 583 (1986). We begin by discussing the appointment, removal, and supervisory provisions of the Act separately. Each of these interferes with the President's performance of his duty to execute the laws. We then consider the combined impact of all of these sections of the statute on the President's constitutionally guaranteed executive powers.

### A.

■ The Act directs that the independent counsel be appointed not by the President, nor by the Attorney General, but rather by a court of law. Even if we assume arguendo that the independent counsel is an inferior officer, her appointment appears quite inconsistent with the Constitution's placement of the executive

---

**22.** "Of the decisions clearly taken [at the Constitutional Convention], perhaps none was as important as the judgment to vest the executive power in a single, elected official, the Presi-

dent." Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch,* 84 COLUM.L.REV. 573, 599 (1984). *See generally* THE FEDERALIST No. 70 (A. Hamilton).

power in the President. A statute that vests the appointment of an officer who prosecutes the criminal law in some branch other than the executive obstructs the President's ability to execute the law—a duty the President can practically carry out only through appointed officials. *See* THE FEDERALIST Nos. 70, 76, 77 (A. Hamilton). The concept of a responsible and accountable unitary executive would mean very little without the power to appoint, for the President's capacity to enforce the law is largely dependent upon the identity and caliber of the officers who compose the Executive Branch, and if the President is without the power to appoint, he cannot define the character of his administration. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court declared unconstitutional a statute that allowed Congress to appoint members of the Federal Election Commission on grounds that congressional appointment of executive officers violated the appointments clause. The Court determined that the Commissioners exercised executive power because they had, among other powers, the power to bring civil actions against violators of the election laws. *Id.* at 138–40, 96 S.Ct. at 691–92.

The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates.... As he is charged specifically to take care that they be faithfully executed, the reasonable implication, even in the absence of express words, was that as part of his executive power he should select those who were to act for him under his direction in the execution of the laws.

....

... Article II grants to the President the executive power of the Government, i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers—a conclusion confirmed by his obligation to take care that the laws be faithfully executed....

*Id.* at 135–36, 96 S.Ct. at 690 (quoting *Myers v. United States*, 272 U.S. 52, 117, 163–64 47 S.Ct. 21, 25, 41, 71 L.Ed. 160 (1926)). Indeed, even when the Supreme Court has upheld restrictions on the President's power to remove officers of the Executive Branch who performed "predominantly quasi-judicial and quasi-legislative" rather than executive duties, *see, e.g., Humphrey's Executor v. United States*, 295 U.S. 602, 624, 55 S.Ct. 869, 872, 79 L.Ed. 1611 (1935), the Court "carefully emphasized that although the members of such agencies were to be independent of the Executive in their day-to- day operations, the Executive was not excluded from selecting them." *Buckley*, 424 U.S. at 133, 96 S.Ct. at 689 (citation omitted).

The independent counsel nevertheless defends her appointment with the proposition that the "plain language" of the appointments clause allows Congress to vest the appointment of inferior officers, including the independent counsel, in a court of law, or in more general terms, that the appointments clause should be read to allow officers in one branch to appoint officers in another branch, *i.e.*, to make "interbranch" appointments. The relevant section of that clause, as we have discussed, is "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S.CONST. art. II, § 2, cl. 2. Examining the words alone, we see two basic possible interpretations: The first, pressed upon us by the independent counsel, is that the Constitution delegates to Congress *without limitation* the power to authorize appointment of any *and all* inferior officers by the President, *any* court of law, or *any* head of department. The second, advanced by appellants, is that the courts of law (Judicial Branch) and heads of departments (Executive Branch) may not be authorized to appoint officers belonging to the other branch. In the earliest case to raise the issue the Supreme Court thought the second interpretation rather than the first to be obviously the one intended by the Framers. "The appointing power here designated, in the latter part of the section,

was, no doubt, intended to be exercised by the department of the government to which the officer to be appointed most appropriately belonged. The appointment of clerks of courts properly belongs to the courts of law...." *In re Hennen,* 38 U.S. (13 Pet.) 230, 257–58, 10 L.Ed. 138 (1839).[23]

More recently, Judge Skelly Wright, dissenting in *Hobson v. Hansen,* 265 F.Supp. 902 (D.D.C.1967), squarely rejected—in our view correctly—the independent counsel's plain meaning argument:

> [I]t is simply not true that Article II expresses any meaning quite so clear. Its language very naturally admits the common-sense reading that courts of law and the other listed offices were meant to appoint only those officers "inferior" *to them....* And the narrower reading harmonizes with the most apparent purpose of Article II: to let Congress clothe Secretaries and courts with the necessary authority for filling vacancies in their own staffs.

*Id.* at 921 (Wright, J., dissenting) (emphasis added).[24]

Although we certainly sympathize with the notion of seeking the meaning of constitutional provisions first in textual language, we do not think this issue can possibly be resolved by invocation of the plain meaning rule. The clause, as we have observed, is certainly susceptible to at least two interpretations, and so we turn next to the available history of its adoption to gain insights into the Framers' purpose. *See Missouri Pac. Ry. v. Kansas,* 248 U.S. 276,

280, 39 S.Ct. 93, 63 L.Ed. 239 (1919). The appointment provision itself represents a major change from the Articles of Confederation, which vested the appointment of officers in the Congress. And the records of the debates of the Convention evince serious discussion of the clause. For example, John Dickenson moved to allow Congress to vest the appointment of some officers in the "Legislatures or Executives of the several states." 2 M. Farrand, *supra* note 11 at 406. This putative encroachment on the President's power was rejected. Subsequently, James Wilson had occasion to object to Senate participation in the appointment process, "as blending a branch of the Legislature with the Executive. Good laws are of no effect without a good Executive; and there can be no good Executive without a responsible appointment of officers to execute. Responsibility is in a manner destroyed by such an agency of the Senate." *Id.* at 538–39. Gouverneur Morris responded that "as the President was to nominate, there would be responsibility, and as the Senate was to concur, there would be security." *Id.* at 539. The tenor of the debate reveals a jealous guarding of the President's appointment power, even against any participation by the Senate, to the end that one man would be solely responsible for choosing government officers. It is true that more time was spent discussing judicial appointments (although much of that discussion was relevant to appointment power in general), but we take that as indication that the Convention was

**23.** We quote this language from *In re Hennen* to refute the independent counsel's claim that the clause has a single plain meaning. We recognize that the impact of this statement was somewhat narrowed by *Ex parte Siebold,* 100 U.S. (10 Otto) 371, 398, 25 L.Ed. 717 (1880). *See infra* pp. 492–94.

**24.** Judge Wright's dissent is similarly quoted merely to show that the clause can easily bear more than one meaning. *Hobson v. Hansen* upheld a statute vesting the appointment of members of the District of Columbia school board in the judges of the United States District Court for the District of Columbia. The federal court in the District of Columbia had, at that time, a dual character, deriving both from Article III and from "powers conferred upon it in the exercise by Congress of its plenary legisla-

tive power over the District of Columbia." *Hobson v. Hansen,* 265 F.Supp. at 907. The court discussed the appointments clause of Article II and interpreted it to allow inter-branch appointments, but the court did not rest its decision on that point, holding rather that even if the appointments clause were interpreted more narrowly, congressional power over the District of Columbia was sufficient to sustain the statute. *Id.* at 919 n. 19. In any event, we are not bound by a decision of a three judge district court. *See San Diego Unified Port Dist. v. Gianturco,* 651 F.2d 1306, 1315 n. 24 (9th Cir.1981); 1B J. MOORE, J. LUCAS & T. CURRIER, MOORE'S FEDERAL PRACTICE ¶ 0.402[1] n. 21 at 16 (2d ed. 1984). The opinion of the court in *Hobson v. Hansen* is discussed further in Part V.

less sure of where to place the appointment of judges than that of "all other Officers."

Debate in the Convention on an earlier version of the appointments clause, which contained no reference at all to inferior officers, suggested that the delegates were concerned as to the practical difficulties of staffing a government of a nation whose distances were vast at a time when travel and communications were slow and often difficult. George Mason accordingly proposed that officers be appointed by a council rather than by the President with the approval of the Senate. Otherwise he worried that the Senate would have to be in continuous session in order to approve appointments. Rufus King responded, however, that "[h]e did not suppose it was meant that all the minute officers were to be appointed by the Senate, or any other original source, *but by the higher officers of the departments to which they belong.*" *Id.* at 539.

Later in the Convention, the inferior officer provision was added with little discussion and it appears therefore that the clause was designed to meet concerns expressed in the earlier dialogue between Mason and King. When the additional language was proposed, Madison observed that "[i]t does not go far enough if it be necessary at all—Superior Officers below Heads of Departments ought in some cases to have the appointment of the lesser offices." *Id.* at 627.[25] In other words, Madison, like King, thought the first part of the appointments clause, without the amendment, bestowed an implied power on principal officers to appoint officers *subordinate to themselves*—a power the amendment merely made explicit (but nonetheless in restricted form since it was given only to the President, courts of law, and department heads). The delegates to the Convention, we conclude, did not even contemplate

that the appointments clause they fashioned permitted Congress to authorize superior officers like department heads to appoint inferior officers subordinate to *other* department heads; still less did they intend that the courts of law could be empowered to appoint officers in the Executive Branch who could not, consistent with the separation of powers, be constitutionally "inferior" to judges.

Turning from the debates of the Convention to the Federalist Papers (which are perhaps even more important as an interpretative aid because they, unlike the records of the Convention, were available to the state ratifying conventions), we note that Hamilton repeatedly and at some length discussed the immense importance of vesting the appointment power in the President. The purpose of these discussions is quite obscure if the only officers the President is constitutionally required to appoint are ambassadors, public ministers, and judges of the Supreme Court. *See* THE FEDERALIST Nos. 70, 76, 77 (A. Hamilton).

The dissent refers to an early version of the Judiciary Bill as an indication that *some* members of the First Congress thought judicial appointment of federal prosecutors constitutionally permissible. Dissent at 533 n. 41. We do not believe that one line from a precursor of a lengthy bill, subsequently modified to provide for presidential appointment of federal prosecutors, *see* Warren, *New Light on the History of the Federal Judiciary Act of 1789,* 37 HARV.L.REV. 49, 109 n. 137 (1923), is persuasive. Indeed, the change would seem more significant than the original language, especially since it may have been motivated by constitutional concerns. For as amicus curiae from the House of Representatives brought to our attention, the appointment provision was revised in re-

---

**25.** It is interesting to note that Madison thereby suggested that the appointments clause before amendment contemplated non-inferior (superior officers) *below* department heads. *See supra* Part II p. 481. Madison did not explain what he meant by "some cases"; he may have been referring to situations where subordinates of Heads of Departments exercised great discretion and so could have been expected to appoint

*their* own subordinates. In any event, the amendment Madison opposed was adopted, thus deciding the issue—other than the President, only heads of departments and courts of law may be authorized to appoint inferior officers. By implication, this decision rejected the notion that officers subordinate to heads of departments are "Superior Officers." *But cf.* Dissent at 531.

sponse to a recommendation by Chancellor Robert Livingston that it would be "better that the Attorney General be appointed by the executive to which department he *necessarily* belongs than to the judicial with which the executive sh[ould] in no sort be confounded[.]" Letter from Robert Livingston to Oliver Ellsworth (June 26, 1789) (on file at Huntington Library, San Marino, California) (emphasis added).

The delegates' discussion at the Convention, the Federalist Papers, and the action of the First Congress all then support an understanding of the appointments clause that would forbid judicial appointment of executive officers. The independent counsel argues that this common sense interpretation of the clause is foreclosed by *Ex parte Siebold*, 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1880), in which the Supreme Court upheld a statute that vested in the courts the appointment of election commissioners, thereby, according to the independent counsel, holding that Congress may generally vest the appointment of executive officers in the courts of law, rather than in the President or the department heads. *See also Hobson v. Hansen*, 265 F.Supp. 902, 912–13 (D.D.C.1967). In *Siebold*, however, the Court did not see the case before it as raising a question of congressional encroachment on the President's power to execute the laws. The statute involved in *Siebold*, unlike the independent counsel statute, did not prohibit the President from ordering his Attorney General to investigate election fraud.[26] The Court framed the question in *Siebold* as implicating only the proper role of the judiciary, not the powers of the President; according to the Court, the issue was whether "the act of Congress imposes upon the Circuit Court duties not judicial, in requiring them to appoint the supervisors of elections." 100 U.S. at 397.

It was not necessary, therefore, that the Court decide whether the appointment of election supervisors by a court deprived the *executive* of a power vested in it by the Constitution. Indeed, the law considered in *Siebold* was an exercise of congressional power under Article I, § 5, cl. 1 of the Constitution which provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members."[27] The election supervisors had no power to initiate prosecutions. Their function included attending the elections, challenging legally dubious votes, keeping watch over the ballot boxes and submitting reports to Congress. Congress presumably could have chosen any method of appointing such officials, including vesting the appointment power in itself. As the Supreme Court observed in *Buckley v. Valeo*, 424 U.S. 1, 137, 96 S.Ct. 612, 690, 46 L.Ed.2d 659 (1976), in the context of a discussion of a Federal Election Commission which included members appointed by Congress, "[i]nsofar as the powers confided in the Commission are essentially of an investigative and informative nature, falling in the same general category as those powers which Congress might delegate to one of its own committees, there can be no question that the Commission as presently constituted may exercise them." Thus Congress' decision before the Court in *Siebold* to authorize the circuit courts to appoint officials charged with tasks the Constitution assigns to Congress itself did not implicate the doctrine of separation of powers except to the extent that it raised the question whether such appointments could be made by a court without violating Article III's case or controversy requirement, and it is only to *that* question that the Court's discussion of the appointments clause is relevant.

**26.** 28 U.S.C. § 597 requires the Attorney General to "suspend all investigations and proceedings" regarding matters within the jurisdiction of an independent counsel.

**27.** The *Siebold* Court itself referred to Art. I, § 4, cl. 1, which provides that Congress may by law regulate "[t]he Times, Places and Manner of holding Elections for Senators and Representa-

tives." However, the role of the election supervisors seems, especially in its information-gathering aspects, most closely related to the power of each House to be the "Judge of the Elections, Returns and Qualifications of its own Members." *See Siebold*, 100 U.S. at 389 (in cases of contested elections, the conduct of the election officers is examined by Congress).

Our reading of *Siebold* is buttressed by the Court's approving reference to *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792), in which several Supreme Court Justices sitting on the circuit courts suggested that a law requiring the circuit courts to undertake administrative duties regarding revolutionary pensions was void because it imposed "upon the courts powers not judicial." *Siebold*, 100 U.S. at 398. *Siebold*, therefore, does not purport to decide whether Congress may divest the Executive Branch of authority to appoint officials who carry out core executive functions. It merely decided, on the authority of the appointments clause, that vesting the appointment of election supervisors in a court did not violate the doctrine of *Hayburn's Case*.

Even were *Siebold* thought to bear more directly on the question whether officers belonging to one branch may appoint officers of another branch, it nevertheless does not support the independent counsel's position, because the Court did not hold that Congress may provide freely for such appointments. Rather, the Court examined the role of the election supervisors, which largely consisted in observing federal elections for Congress, and concluded that

> in the present case there is no such *incongruity* in the duty required as to excuse the courts from its performance, or to render their acts void. It cannot be affirmed that the appointment of the officers in question could, with any greater propriety, and certainly not with equal regard to convenience, have been assigned to any other depositary of official power capable of exercising it. Neither the President, nor any head of department, could have been equally competent to the task.

*Id.* at 398 (emphasis added). The Court, in other words, could not readily determine to which branch the appointment most naturally belonged; the appointment seemingly could not have been made by any officer other than a judge "with any greater propriety." This point alone distinguishes the election supervisors from typical executive officers. *Ex parte Siebold* therefore does not suggest that Congress may vest the appointment of a purely executive officer, such as the independent counsel, in a court of law.

■ What kind of appointments then would, by virtue of their "incongruity," violate the appointments clause? We think it must be incongruous if an officer of one branch is authorized to appoint an officer of another branch who is assigned a duty central to the constitutional role of that other branch.[28] The independent counsel's contention that she can be constitutionally appointed by a court necessarily suggests, as was extensively explored at oral argument in this and previous cases raising the same issue, the opposing general proposition that the appointments clause is no barrier to legislation authorizing interbranch appointments.[29] That is to say, a court could be empowered to appoint all officers subordinate to a department head. (For purpose of considering this issue, we have assumed that the independent counsel is an inferior officer and we will further assume that principal officers include department heads and judges.) If, for example, two-thirds of the House and Senate—a sufficient number to override a veto—disagreed strongly with the President's agricultural policy, Congress could place in a particular court, perceived as more in agreement with Congress' policy views, the authority to appoint all Department of Agriculture officers subordinate to the Secretary. That device would neatly prevent the President from implementing his own agricultural policy. Or more shocking, be-

---

**28.** The only exception to this principle is that Congress may authorize the Executive Branch or the courts to appoint Congress' officers. There is no incongruity, as *Siebold* implicitly recognized, in Congress' authorizing either the executive or the courts of law to appoint congressional officials. *See Buckley v. Valeo*, 424 U.S. at 138–39, 96 S.Ct. at 691. Such a device does not implicate separation of powers, be-cause Congress maintains ultimate control, through legislation, over the appointment process.

**29.** It is not even clear that Congress can provide for inter-departmental appointments. *See supra* p. 492. But, of course, that issue is not before us.

cause of the President's Commander-in-Chief and foreign policy functions, Congress could employ the same technique to prevent the President from exercising effective control over either the State or Defense Department. It is difficult to see, if the independent counsel is correct concerning inter-branch appointments, why Congress could not delegate to a particular court—perhaps by a definition that fitted only one district judge—the appointment of all Executive Branch officers (save department heads).[30]

Perhaps more plausible, however, is a scenario closer to the one presented by this case. Let us assume that Congress has lost confidence in the President's policy implicating only one subject matter within a department's jurisdiction—perhaps U.S. policy towards Latin America, or arms control negotiations, or the Executive Branch's presentation of cases to the Supreme Court. Under the independent counsel's view, Congress would face no constitutional impediment in requiring that a particular court appoint the officials responsible for implementing those policies. And as with the Act before us, Congress could forbid *any* other Executive Branch official to interfere with the special appointee's jurisdiction.[31]

Or reversing the inter-branch appointment device, Congress, if it had the constitutional authority the independent counsel asserts and was dissatisfied with the trend of federal judicial decisions, might place

authority to appoint all inferior judicial officers including Justices' and judges' clerks in one department head (perhaps the Attorney General), thereby hoping to influence opinions or at least to obstruct the perceived undesirable trend.[32]

It seems obvious to us that all of these examples are so at odds with the doctrine of separation of powers or the President's unitary executive authority as to be plainly contrary to our Constitution. The independent counsel and various amici contend that it is unnecessary to consider these hypotheticals to hold the independent counsel's appointment constitutional, but we do not understand why that is so since the interpretation of the appointments clause offered by the independent counsel would flatly permit Congress' authorization of inter-branch appointments. Of course most judges have a good deal more experience with criminal prosecution than with foreign affairs, so the independent counsel suggests that it is less incongruous for a court to appoint an independent counsel than, let us say, a diplomatic special envoy, but her position would, even if we could detect its principled limits, surely at least permit court appointment of all Justice Department lawyers—including the Solicitor General—who either appear before the federal courts or supervise those who do.[33] And even that necessary extension of the independent counsel's argument seems so to burden her argument with blatant unconstitutional weight as to sink it.[34]

---

**30.** One might ask why, if Congress had lost that degree of confidence in the President, it would not simply have used its impeachment power. That latter course, however, might in certain circumstances seem less attractive because of the need, albeit perhaps more political than legal, to find a high crime or misdemeanor.

**31.** Counsel for the House of Representatives at oral argument insisted that Congress could require court appointment of the Solicitor General, but was uncertain whether the President could be forbidden the opportunity otherwise to communicate his legal views to the Supreme Court by an amicus brief.

**32.** If, as the independent counsel argues, judges and department heads are only inferior officers and the Attorney General was deemed more sympathetic to congressional views than the

President, the Attorney General could be given plenary authority to appoint all federal judges.

**33.** Our dissenting colleague seems to suggest that the plan she cites from an early draft of the first Judiciary Act to have the Supreme Court appoint the Attorney General would be constitutional. Dissent at 533 n. 41. *See* discussion *supra* pp. 492–93. Apparently then she would have little problem with at least one part of this hypothetical.

**34.** The dissent offers no principle upon which incongruity can be judged but rather contends that *Congress'* notion of incongruity, measured by the purpose of the statute, is determinative in interpreting the Constitution. Dissent at 533–34. That is consistent with our dissenting colleague's primary themes that the Act should be upheld because it redresses a constitutional

Nor do we think *Young v. United States ex rel. Vuitton et Fils S.A.,* —— U.S. ——, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), is authority, as the independent counsel claims, for judicial appointment of federal prosecutors. In that case the Supreme Court sanctioned the practice of federal judges' appointing disinterested private attorneys to prosecute contempt actions based on perceived violations of a judge's own orders because "the initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function." *Id.,* 107 S.Ct. at 2131. Since a court could not constitutionally compel a United States Attorney to prosecute (the relevant United States Attorney's Office had actually expressed disinterest, *id.* at 2129), the court would otherwise be unable to assure the effectuation of its orders. Indeed, the Court's decision rests on its appreciation for separation of powers and the unfettered discretion of the Executive Branch to determine whether to prosecute crimes. The Court observed that

> [t]he fact that we have come to regard criminal contempt as 'a crime in the ordinary sense' does not mean that any prosecution of contempt must now be considered an execution of the criminal law *in which only the executive branch may engage....* [T]hese proceedings are not intended to punish conduct proscribed as harmful by the general criminal laws. Rather, they are designed to serve the limited purpose of vindicating the authority of the court.

*Id.* at 2133 (emphasis added) (citation omitted).

In sum, we think the Constitution generally precludes inter-branch appointments. For the reasons further elaborated in Parts IV and V of this opinion, moreover, court appointment of prosecutors presents a more fundamental incongruity with our constitutional scheme than virtually any other type of inter-branch appointment, because it blurs that cherished separation of prosecutor and judge which is a crucial aspect of the Constitution's protection of individual liberty.

### B.

■ The Act further trenches on the concept of a unitary executive and departs from separation of powers doctrine by substantially limiting the President's ability to remove or supervise the independent counsel.[35] It provides that an independent counsel "may be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General and only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties." 28 U.S.C. § 596(a)(1). The Act places further restrictions on the President's removal and supervisory powers, including an extraordinarily broad provision authorizing the Special Court to review removal decisions of the Attorney General and explicit limitations on the Attorney General's authority to supervise the independent counsel. We discuss the "good cause" provision first, however, because we believe that, standing alone, it is a significant enough restriction to raise serious constitutional questions.[36]

---

imbalance of power, *compare infra* pp. 506–07, and that Congress' interpretation of the Constitution is due judicial deference, *compare supra* p. 487 note 20.

**35.** We consider this issue, like the inter-branch appointment issue, assuming arguendo that the independent counsel is an inferior officer.

**36.** Although no independent counsel has been removed to date, consideration of the impact of these restrictions is now ripe because the tenure they create for the independent counsel has a "here-and-now" impact upon the appellants. *See Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct.

3181, 3189 n. 5, 92 L.Ed.2d 583 (1986). The issue can be considered from two points of view. In one sense, the question of ripeness before us is identical to that framed by the *Bowsher* Court; the restrictions on removal, as we will show, place the Special Court in a position of power over the independent counsel, thereby "creat[ing] the here-and-now subservience to another branch that raises separation-of-powers problems." *Id.* (quoting *Synar v. United States,* 626 F.Supp. 1374, 1392 (D.D.C.1986)). From a different perspective, the issue here is the mirror image of that in *Bowsher,* because the removal restrictions grant the independent counsel a "here-and-now" *freedom* from supervi-

**1.**

Power to remove an executive officer is important principally because it permits the President to control the performance of that officer. *See Synar v. United States,* 626 F.Supp. 1374, 1400 (D.D.C.1986). Even more than the appointment power perhaps, authority to remove an officer who strays from the President's desired policy direction guarantees the President the ability to channel that officer's course of action. As Madison said in the First Congress:

> If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.

1 ANNALS OF CONG. 499 (J. Gales ed. 1789); *see also Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

The Constitution, to be sure, does not require that every officer of the United States be removable at the will of the President. The civil service laws, designed to abolish the spoils system—to have merit rather than politics govern the appointment and tenure of civil servants—restrict the President's removal power. *See Myers,* 272 U.S. at 174, 47 S.Ct. at 44. Politics, however, is in one sense policy, and civil servants are not thought to be the President's policymakers. Rather, they take direction in their discretionary duties from the political appointees of the President who help the President fashion and execute his policies. *See Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 2686, 49 L.Ed.2d 547 (1976) (plurality) ("Limiting patronage dismissals to policymaking positions is sufficient to [implement policies of new administration]. Nonpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party."). Members of the civil service enjoy protection against removal largely because of their limited role. *See* Gifford, The Separation of Powers Doctrine and the Regulatory Agencies After *Bowsher v. Synar,* 55 GEO.WASH.L.REV. 441, 467 (1987) ("As room for policy formulation increases, congressional limitations upon presidential influence become problematic.").

In *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), the Supreme Court recognized another limitation on presidential removal power. *Humphrey's Executor* corrected the suggestion found in *Myers* that every officer appointed by the President with the advice and consent of the Senate must be freely removable by the President. The Court recognized that "it is within the power of Congress under the 'Necessary and Proper' Clause, Art. I, § 8, to vest authority that falls within the Court's definition of executive power in officers who are not subject to removal at will by the President and are therefore not under the President's direct control." *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3206, 92 L.Ed.2d 583 (1986) (White, J., dissenting) (discussing *Humphrey's Executor* ).

*Humphrey's Executor,* however, has not been read to validate every removal restriction. *See Morgan v. Tennessee Valley Auth.,* 115 F.2d 990 (6th Cir.1940), *cert. denied,* 312 U.S. 701, 61 S.Ct. 806, 85 L.Ed. 1135 (1941). The *Humphrey's Executor* Court itself was careful to limit its holding to officials who had "quasi-legislative or quasi-judicial" powers, leaving the decision in *Myers* intact insofar as it related solely to "purely executive officers." *Humphrey's Executor,* 295 U.S. at 629, 632, 55

___

sion and control by the President inconsistent with the constitutional doctrine of a unitary executive.

The dissent agrees that the removal restrictions are ripe save any consideration of the Special Court's scope of review. *See* Dissent at 522–23 n. 15; *compare* pp. 501–03 *infra.* It seems to us, however, that even the dissent's limited tack still sails directly into the *Bowsher* wind. To ask, as does the dissent, whether it is likely that the independent counsel would have actually behaved differently under a more restricted scope of review is equivalent to asking, as the Court refused to do in *Bowsher,* whether one could identify the manner in which a Comptroller General's behavior would be modified if Congress did not have some control over his removal.

S.Ct. at 874, 875. *Humphrey's Executor* is therefore noteworthy partly for what it does *not* say. Faced with the task of distinguishing the case before it from *Myers*, the Supreme Court did not limit *Myers* by noting that the statute at issue there allowed the Senate to control the removal of an executive officer, whereas the Senate retained no role at all under the statute at issue in *Humphrey's Executor*. Nor did the Court distinguish *Myers* on the basis that in that case the President had no power without Senate consent to remove the officer, whereas in *Humphrey's Executor* the President had at least the power to remove for cause. The Court deliberately chose not to rely on these differences; it read *Myers* as an absolute prohibition on any restriction of the President's power to remove a purely executive officer whom he had appointed. Instead, the Court validated the removal restriction in *Humphrey's Executor* because the Federal Trade Commissioners were not purely executive officers, but rather performed quasi-judicial and quasi-legislative functions.[37]

Although *Myers* and *Humphrey's Executor* both concerned officers who were appointed by the President, whereas the independent counsel was appointed by the Special Court, we think the Supreme Court's analysis of the President's removal power in both cases applies to an officer who, like the independent counsel, is charged with an indisputably executive function. The independent counsel argues that because she is an inferior officer not appointed by the President, Congress may restrict her removal under the reasoning of *United States v. Perkins*, 116 U.S. 483, 6 S.Ct. 449, 29 L.Ed. 700 (1886). *Perkins* was a suit by

a Navy cadet-engineer to recover pay accruing after he was discharged by the Secretary of the Navy in contravention of a law forbidding discharges in peacetime except by court-martial. The Supreme Court adopted the language of the Court of Claims, which said that "[w]e have no doubt that when Congress, by law, vests the appointment of inferior officers in the heads of departments it may limit and restrict the power of removal as it deems best for the public interest." *Id.* at 485, 6 S.Ct. at 450. Although appointed by a court rather than a department head, the independent counsel maintains the same reasoning applies to her. An officer's removal may be restricted, we are told, if the officer was not appointed by the President in the first place. But it cannot be that a restriction on the power of the President to remove an officer appointed by him, a restriction that under *Myers* unconstitutionally interferes with the President's duty to oversee the execution of the law, becomes constitutional if the power of appointment as well is removed from the President and all other members of the Executive Branch. Depriving the Executive Branch of appointment power *increases* rather than decreases the Act's interference with the President's prerogatives. Accordingly, in *Humphrey's Executor*, the Court treated the President's power to appoint the FTC Commissioners as a factor to be weighed *against* the argument that a restriction on removal encroached upon the President's executive authority. The Federal Trade Commission was meant by Congress to "be independent of executive authority *except in its selection.*" 295 U.S. at 625, 55 S.Ct. at 872 (emphasis in original). This point

---

**37.** We disagree with the dissent's contention that *Humphrey's Executor* and *Weiner v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1985) treat removal restrictions based on congressional notions of the need for independence rather than by the Court's characterization of the officer's function as non-executive, for both cases closely analyze the precise role of the officers involved. Dissent at 529–30. The Court in *Weiner* was particularly explicit about the importance of this characterization: "[T]he most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function

that Congress vested in the War Claims Commission." 357 U.S. at 353, 78 S.Ct. at 1278. And in *Weiner* this analysis was uncomplicated —the War Commissioners were judges, pure and simple. Judges, like members of the civil service, *see supra* p. 497, are not thought of as policymaking officials. "[P]olicy arguments are more properly addressed to legislators or administrators, not to judges." *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 864, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984). *See also Gifford, supra* p. 497, at 466.

has been reemphasized in subsequent Supreme Court discussions of the case. *See Bowsher*, 106 S.Ct. at 3195 n. 2; *Buckley v. Valeo*, 424 U.S. 1, 136, 96 S.Ct. 612, 690. The independent counsel thus turns the proper analysis of the relationship between the President's appointment and removal powers on its head. In that regard, it should not be overlooked that in *Perkins* the officer in question was appointed by a member of the Executive Branch, and therefore the President retained at least indirect control over his selection.[38] Furthermore, the cadet-engineer, like a civil servant, was not himself charged with carrying out an executive function that required the exercise of policy discretion. So *Perkins* in our view is wholly inadequate support for the independent counsel's defense of the statute's removal provisions. *See Myers*, 272 U.S. at 161, 47 S.Ct. at 40 ("The *Perkins* case is limited to the vesting by Congress of the appointment of an inferior officer in the head of a department.").

To be sure, Supreme Court Justices have expressed dissatisfaction with the distinctions drawn in *Humphrey's Executor. See, e.g., Bowsher v. Synar*, 106 S.Ct. at 3207 n. 3 (White, J., dissenting); *FTC v. Ruberoid Co.*, 343 U.S. 470, 487–88, 72 S.Ct. 800, 810, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting). They contend, not without force, that the FTC Commissioners' duties included law enforcement responsibilities and so *Humphrey's Executor's* reliance on the Commissioners' quasi-judicial and quasi-legislative functions is inadequate to explain the case—and to limit its future applicability.

Even under this alternative reading, which recognizes certain executive functions performed by the FTC, *Humphrey's Executor* cannot, it seems to us, sanction the Act's good cause removal limitation. In *Humphrey's Executor*, the Commission-

ers were described as a "body of experts" whose purpose was "to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." 295 U.S. at 625, 628, 55 S.Ct. at 872, 874. An important part of the Commissioner's role was to flesh out the very general legislative standard contained in the FTC Act. The Federal Trade Commission therefore was part and parcel of the very statute it was assigned to enforce —it actually created the law of fair trade in the course of adjudicatory enforcement proceedings.[39] "If all [the FTC] has to do is to order the literal statute faithfully executed, it would exercise a function confided exclusively to the President and would be subject to his control." *FTC v. Ruberoid Co.*, 343 U.S. 470, 488, 72 S.Ct. 800, 810, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting). According to that view then, the Federal Trade Commission Act did not divest the President of his constitutional duty to oversee the execution of the law because "any such duty [was] necessarily limited to a great extent by the content of the laws enacted by the Congress," *Bowsher*, 106 S.Ct. at 3207 (White, J., dissenting), and part of the "content" of the fair trade law is the Commission itself. That analysis simply does not apply to the Ethics in Government Act because this statute entrusts enforcement of a *pre-existing* body of criminal law to an official neither appointed nor removable by any member of the Executive Branch. What is more, the independent counsel has no legislative or judicial role regarding the United States criminal code; her only responsibility is to execute it, and that is a responsibility the Constitution assigns unequivocally to the Executive Branch. *Cf. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986);

---

**38.** Of course, the President, as the Commander-in-Chief of the Armed Forces, had the power to give Perkins a lawful order, the refusal of which would result in court-martial and removal. Thus the statute considered in that case did not significantly impair the President's ability to control and direct the officers of the Executive Branch.

**39.** When *Humphrey's Executor* was decided, the FTC had not asserted any rulemaking authority. *See Strauss, supra* note 22, at 615. Thus, there was in fact no separate body of law for the FTC to enforce independent of that law which was created through the enforcement procedure itself.

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (danger of encroachment on the Judicial Branch is less when matters removed from the jurisdiction of Article III courts concern rights created by Congress that could constitutionally be addressed by Congress itself). *Humphrey's Executor* does not even suggest that a statute which excludes the President from the enforcement of preexisting law would be constitutional.

No party or amicus before this court denies that the independent counsel is a "pure" executive officer. The issue is, in any event, foreclosed by *Bowsher*, in which the Court said "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law" and the exercise of judgment "concerning facts that affect the application of the [law]" is another characteristic of the executive function. 106 S.Ct. at 3192. The independent counsel is a fortiori an executive officer under this definition. She must determine whether the facts uncovered in her investigation may constitute illegal conduct; in order to make this judgment, she must "interpret[ ] a law enacted by Congress." Those legal interpretations and law enforcement functions exercised by the independent counsel carry more—much more—executive discretion than the specific duties of the Comptroller General involved in *Bowsher;* no one asserts that her duties—as was claimed of those of the Comptroller General—are "essentially ministerial and mechanical." *Id.; see Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985).

Although he has frequently dissented from cases overturning laws on separation of powers grounds and has advocated a pragmatic view of the separation of powers doctrine, Justice White has repeatedly stressed the core executive nature of the prosecutorial function and the consequent importance of ensuring that the President retain the power to remove core executive officers at will. *See, e.g., Bowsher,* 106 S.Ct. at 3207 (White, J., dissenting) ("[T]here are undoubtedly executive functions that, regardless of the enactments of

Congress, must be performed by officers subject to removal at will by the President."); *INS v. Chadha,* 462 U.S. 919, 1002, 103 S.Ct. 2764, 2810, 77 L.Ed.2d 317 (1983) (White, J., dissenting) ("A legislative check on an inherently executive function, for example, that of initiating prosecutions, poses an entirely different question."); *Buckley,* 424 U.S. at 285, 96 S.Ct. at 758 (White, J., concurring in part and dissenting in part) ("I would be much more concerned if Congress purported to usurp the functions of law enforcement. . . .").

Like Justice White, we cannot see how prosecution of federal criminal law can be other than an inherent, or core, executive function. It was suggested at oral argument, however, that because the Constitution does not mandate the creation of lower federal courts, but leaves that decision to the discretion of Congress, it was not inevitable that there would even be federal prosecutors, much less that the prosecutorial function was placed in the Executive Branch. But the Framers did foresee that the new government they were establishing would sometimes need to enforce its laws through criminal prosecutions. They actually provided in important detail for the procedure to be used in such cases—the Constitution directs that all federal criminal trials shall be by jury and "shall be held in the State where the said Crimes have been committed." U.S. Const. art. III, § 2, cl. 3. If no lower federal courts had been created, then federal crimes would have been prosecuted by federal prosecutors in the state courts, in which case the Supremacy Clause would obligate state court judges to apply federal law. *See generally Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); *Claflin v. Houseman,* 93 U.S. (3 Otto) 130, 23 L.Ed. 833 (1876); THE FEDERALIST No. 82 (A. Hamilton). Nothing in the Constitution gives Congress the power directly to require state officers to enforce federal criminal law, *cf. Kentucky v. Dennison,* 65 U.S. (24 How.) 66, 107–08, 16 L.Ed. 717 (1860), overruled by *Puerto Rico v. Branstad,* —— U.S. ——, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987) (mandamus lies in federal court to require a state officer to

comply with a ministerial—not discretionary—constitutional duty),[40] and any attempt to do so would conflict with concepts of federalism, state sovereignty, and the Tenth Amendment. So at the outset the Framers must have foreseen the necessity of officers of the United States commissioned to enforce federal criminal law.

We think it inevitable that under the Constitution such officers must be members of the Executive Branch subject to the control of the President. In contrast to the limited grants of legislative power made in Article I, Article II grants authority to the President in broad terms: "[T]he executive Power shall be vested in a President," U.S. Const., art. II, § 1, and does not individually list all his various duties, but it does specifically require that he shall be the Commander–in–Chief of the Armed Forces and that he may make treaties with the advice and consent of the Senate and receive ambassadors. *Id.,* § 2. It also directs the President to "take Care that the Laws be faithfully executed." *Id.,* § 3. The dissent's suggestion that this provision is only a limitation on the President's authority—that the President is required to execute only those laws that Congress delegates to him—implies that all sorts of executive officers could be delegated authority to enforce laws beyond the President's control or influence. Dissent at 524 n. 19. That would mean that Congress could restrict presidential removal, as far as we can discern, of virtually any executive officer. We think that interpretation of the Constitution is utterly implausible

besides being palpably inconsistent with *Myers* and *Humphrey's Executor.* We conclude rather that the Constitution envisioned two core domains of presidential responsibility—foreign affairs and law enforcement—and it is apparent from the structure and language of the Constitution that the initiation of a criminal prosecution in our federal system is entrusted to the President. *See Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed. 2d 714 (1985); *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed. 2d 1039 (1974).

**2.**

Even if a simple "good cause" restriction on the President or his subordinate's removal power over the independent counsel were constitutional, this statute, prior to its recent amendment, restricted Executive Branch authority a good deal more than the normal "good cause" limitation.[41] Its delegation to the Special Court to "review" the Attorney General's dismissal of the independent counsel so diminished the Attorney General's removal authority as to render it almost illusory. Any review, regardless of scope, might be problematic because the court which reviewed the dismissal is the very court that appointed the independent counsel and for that reason, of course, "might well be expected to view [her] as its protege." *In re Sealed Case,* 829 F.2d at 65 (Williams, J., concurring and dissenting).

The scope of review, however, is quite extraordinary—given the probable nature

---

**40.** *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), is not to the contrary. It holds that a state quasi-judicial administrative agency can be compelled, like a state court, to apply federal law and conform to federally-mandated procedures. *Id.* at 760–61, 102 S.Ct. at 2137–38.

**41.** As the dissent notes at 522, Congress, after oral argument in this case, modified the removal provisions of the Act. Judicial review of removal of an independent counsel has been transferred from the Special Court to the federal district court and the scope of review has been narrowed. It has been suggested that this legislative change, made after appellants were held in contempt based on the district judge's determination of the constitutionality of the statute before amendment, renders the prior

challenge to the removal provisions not ripe even if originally ripe. Supplemental Brief of Amicus Curiae United States Senate. But if the "here-and-now" impact of the original removal provisions in inducing independent counsel subservience to the Special Court made consideration of that provision ripe at the time appellants raised their challenge below, *see supra* p. 496 note 36, Congress could not, by subsequently changing the removal provisions, affect the ripeness of the original challenge or the appeal from the contempt order. Nor do we, unlike the dissent, believe that Congress' subsequent "clarification" of the scope of review, by amending the original language, has any bearing on our interpretation of that original language as challenged by appellants in the contempt proceeding.

of an Attorney General's decision to remove an independent counsel. Reinstatement may be ordered if the "removal was based on error of law *or fact.*" But such a decision would likely turn on issues of public policy, for example the appropriate limitations to be placed on a prosecutor's zeal, that are beyond traditional judicial competence. *See Federal Radio Comm'n v. General Elec. Co.,* 281 U.S. 464, 469, 50 S.Ct. 389, 390, 74 L.Ed. 969 (1930). If reviewed at all, these kinds of Executive Branch determinations are normally examined under a deferential arbitrary and capricious standard because of concerns for separation of powers. *See Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 276–77, 53 S.Ct. 627, 632–33, 77 L.Ed. 1166 (1933). *See generally* 4 K. DAVIS, ADMINISTRATIVE LAW § 29.10 (1958) (a system of review that requires a federal court merely to repeat the decision process of an administrative or legislative agency violates Article III; this discussion omitted from later editions). By authorizing review of any question of law or fact, Congress invites the Special Court to determine what facts are relevant and thereby implies that the Special Court has authority to determine for itself the appropriate standard against which the independent counsel's conduct is to be measured. That scope of review would seem to exceed even de novo, which as we have recently held, limits a court "to make anew the same judgment made by the agency," *Doe v. United States,* 821 F.2d 694, 698 (D.C. Cir.1987) (*en banc*) and to apply the same standard applied by the agency, *id.*[42]

Nothing in the Act, moreover, indicates that the Special Court's "review" is restricted to the record before the Attorney General at the time of the removal decision; indeed, since such a decision would typically be made for policy reasons, and not because some fact appears in a hypothetical record, review of the record seems anomalous in this context. At oral argument, counsel for the independent counsel suggested that an evidentiary record might be created before the court itself in a civil action brought by a discharged independent counsel, 28 U.S.C. § 596(a)(3), which further suggests that the court could consider information not before the Attorney General when he made his decision.[43] *Cf. United States v. Bianchi & Co.,* 373 U.S. 709, 714–15, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963) ("reviewing function is one ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based"). In truth, because the Special Court has more of a supervisory role over the independent counsel than does the Attorney General, the Special Court, when it reviews his removal decision, might well have more or different information even before such a proceeding than did the Attorney General when he initially made the decision. In this context the word "review" is a misnomer; the Special Court is basically a "superior and revising agency" with a veto over the Attorney General's decision. *See General Elec. Co.,* 281 U.S. at 467, 50 S.Ct. at 390.

This scheme is analytically indistinguishable from one whereby the Attorney General could remove the independent counsel only by petitioning the Special Court for a termination order which the Special Court could grant or not following its own independent investigation of the facts and the law. The only difference between such a hypothetical statute and the Act is the timing of the Special Court's "review," but the Special Court's power to appoint an interim independent counsel while it reviews a dismissal renders the matter of timing inconsequential. *See* 28 U.S.C. § 593. Hence, we think it likely that any order by the Attorney General to an independent counsel, even if backed by a threat of removal,

---

**42.** For this reason, the scope of review may itself be unconstitutional, but we need not reach that issue. Scope of review is relevant to our discussion because of its "here and now" impact on the Attorney General's perceived power to remove the independent counsel.

**43.** Although it does not appear that most decisions of the Special Court are directly reviewable by the Supreme Court or any other court, we assume that because section 596(a)(3) authorizes the independent counsel to bring a civil action, an appeal to the Supreme Court would lie.

would be ineffectual, unless the independent counsel believed the Special Court would itself agree with the order. The result of this "double key" system is therefore that the Attorney General is powerless to remove the independent counsel unless he can win the consent of the Special Court. We have then almost a precise analogy to *Myers*, where, under the statute declared unconstitutional, the President could not remove the postmaster without the concurrence of the Senate.

**3.**

The "good cause" limitation on removal, coupled with the Act's extraordinary judicial review provisions and the power of the Special Court to appoint an interim independent counsel and to reinstate a fired independent counsel compromise the President's ability to oversee the execution of the law. Not content with eliminating the President's implicit power to direct or influence the independent counsel, Congress went even further to render the President impotent to affect the independent counsel's behavior. From the moment an independent counsel is appointed, the Act, which guarantees the independent counsel "independent authority" to carry out her duties, 28 U.S.C. § 594(a), ensures that the Attorney General cannot influence any aspect of her performance, including the scope and duration of the investigation, the standards to be applied in making a decision to prosecute or not, the direction of the investigation when competing executive concerns are implicated, or, on a more mundane, but nevertheless important level, details about staffing and budgetary matters.

The independent counsel is free to ignore Department of Justice policy if it is "not possible" to follow it, and that judgment is for her alone to make. 28 U.S.C. § 594(f). The consequence of this scheme, (described in more detail in Part IV), is that targets of an independent counsel may be subjected to investigations and prosecutions governed by rules different from those that apply to the investigation of any other citizen and therefore it strikes at the very heart of the unitary executive doctrine, which has as a primary purpose the "uni-

tary and uniform administration of the laws." *Myers*, 272 U.S. at 135, 47 S.Ct. at 31.

As we further discuss in Part V, important decisions about the scope of the investigation and the very identity of the targets are made not by the Attorney General, but by the Special Court. The absence of Executive Branch supervisory authority is perhaps most troubling when an investigation veers toward matters affecting international relations and the independent counsel adopts positions at odds with the remainder of the Executive Branch. For example, in another investigation under the Ethics in Government Act that has previously been before this court, the independent counsel attempted to subpoena the Canadian Ambassador in the face of strenuous opposition by the Department of State on this delicate diplomatic question. *See United States v. Deaver*, No. 87–096 (D.D.C. June 22, 1987) [Available on WESTLAW, 1987 WL 13365]. And in oral argument before this court regarding still another independent counsel investigation, we were advised that in the event of a dispute between the independent counsel and the President over foreign policy and its implications for a prosecution, the independent counsel would 'in principle' prevail over the President.

In sum, Congress has created an Executive Branch office to perform a core presidential function and as far as we can determine precluded the President from exercising any influence over the performance of that office even when its performance might interfere with a range of other Executive Branch responsibilities, including those national security duties directly and solemnly entrusted to the President for the protection of all Americans.

**C.**

We have, up to this point, considered the Act's provisions individually, examining in turn the appointment, removal, and supervisory sections of the Act. We believe each of these provisions to be a departure from the related doctrines of separation of powers and of a unitary executive, but we acknowledge that this area of the law is

not marked by distinct guideposts. *See INS v. Chadha,* 462 U.S. 919, 963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317 (1983) (Powell, J., concurring in the judgment). We therefore are obliged to consider how much of an intrusion into the executive function or how great a departure from the doctrine of separation of powers is consistent with the Constitution. *See Nixon v. General Servs. Admin.,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). We are well aware that the doctrine of separation of powers is not a matter of absolutes; the Constitution does not require "a hermetic sealing off of the three branches of Government from one another." *Buckley,* 424 U.S. at 121, 96 S.Ct. at 683.[44] And so, seemingly plausible arguments can be made that the Act's various limitations on executive power are, considered in isolation from each other, different only in degree from limitations that have been upheld in the past.

Yet, in the end, even if some executive officers may constitutionally be appointed by judges, or may constitutionally be insulated to some extent from removal and supervision by the President, we think it tenuous to claim that any officer may be entrusted with all the powers of the Attorney General,[45] indeed of the President, and charged with the exclusive enforcement of the criminal law as applied to specific individuals. *Cf. Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), (Court regarded as key to its separation of powers analysis whether or not Congress had entirely withdrawn a function from the cognizance of the branch to which it is constitutionally assigned, *id.* 106 S.Ct. at 3260, and whether the body to which some part of one

branch's responsibility has been assigned can exercise substantially all of the powers of that branch, *id.* at 3258). We are, as we have concluded, concerned with one of the President's core executive functions, explicitly provided in the Constitution, that he take care that the laws be faithfully executed. The Act considered as a whole thus strikes us as a serious encroachment on the President's executive authority, and we turn now to consider whether this encroachment can be justified.

## IV.

█ The primary defense of the constitutionality of the Act presented by the independent counsel and supporting amici is one of necessity. We are told that Presidents can no longer be trusted to ensure that their senior appointees obey the criminal laws. The independent counsel claims that "the constitutional crisis which grew out of Watergate is a sufficient demonstration that without a mechanism to achieve this goal, there is grave question whether we are in fact 'a Nation capable of governing itself effectively,'" (quoting *Buckley,* 424 U.S. at 121, 96 S.Ct. at 683). This argument is sometimes cast in terms of an institutional lack of confidence in the Justice Department:

[F]ifty years of the nation's history involving the Teapot Dome, Truman Administration, and Watergate scandals, has demonstrated a generally recognized inability of the Department of Justice and the Attorney General to function impartially with full public confidence in investigating criminal wrongdoing of high-ranking government officials of the same political party.

---

**44.** Justice Jackson gave the classic warning against a rigid invocation of separation of powers:

The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence,

autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress.

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

**45.** The only power of the Attorney General not given to the independent counsel is the authority to apply to a federal judge for a wiretap. 28 U.S.C. § 594(a).

*In re Olson*, 818 F.2d 34, 42 (D.C.Cir.Indep. Couns.Div. (1987)). But the argument is really directed at the Presidency itself, for so long as the President takes care that the laws be faithfully executed, we see no reason why he cannot ensure that his Attorney General and senior officials in the Justice Department follow his lead. A good example of such presidential action arose during the very Truman administration scandals referred to by the Special Court. After the Attorney General improperly discharged the special prosecutor he had appointed, President Truman in turn removed the Attorney General. Of course the Attorney General might, on his own, or by direction of the President, determine that for appearances' sake or because of an actual conflict of interest a special prosecutor or independent counsel should be appointed for a particular investigation, buttressed perhaps with an independence guaranteed by regulation. That device has been employed and its legality tested and affirmed. *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).[46]

The President then has a range of choices and techniques to ensure that corruption at senior levels in his administration is deterred and, if not deterred, punished. Clearly this statute is based on the premise that the President himself cannot be trusted to choose wisely among these options. Or that even if he could, the institutional conflict of interests in which he is placed is so intolerable as to suggest the need after two hundred years for a novel government agency that removes the appearances of conflict. But it is by no means clear to us that this ostensible problem is truly a conflict of interest. We had not previously thought that the obligation upon any executive—let us say the President of a corporation or a Union—to ensure probity among his subordinates presents a conflict of interest as we judges and lawyers think of the meaning of that phrase. It is surely never easy to effect the removal or prosecution of trusted subordinates; in human terms alone the discomfort can be intense. But that discomfort is hardly a conflict of interest. Otherwise, the independent counsel device would seem to be needed as an attachment to all bureaucratic institutions in our society.

It is suggested, however, that the conflict of interest is a political one. The President would be reluctant to see his Justice Department proceed against senior administrative appointees because his relationship with these officials involves more than mere ties of personal loyalty—such as could be found in any bureaucratic institution—it comprehends political allegiances and therefore such a prosecution may politically damage the President himself. Hence the President cannot be trusted to make decisions regarding matters that may threaten the political goodwill he has accumulated in his public life and upon which he depends for his continued success. As a principle to justify the use of congressional power to deprive the President of prosecuting authority, however, this contains no feasible limitation. Why could Congress not, according to this notion, require an independent counsel whenever the target of inquiry were a political ally of the President: Senator, Congressman, Governor, campaign contributor, or in fact any person active in affairs of the President's party? Nor do we see, if political allegiance really does generate a conflict of interest, why the argument cannot just as easily be made also to support the opposite application— that the President be deprived of authority to prosecute his political adversaries. If we follow this political conflict of interest reasoning to its logical end, it points to the desirability of removing the Department of Justice entirely from presidential influence—which we think must be a constitutional reductio ad absurdum.[47]

**46.** Or Congress might create an "independent" prosecutorial office to be filled by an officer appointed by the President (and under his supervision) with the advice and consent of the Senate. Such an office was created during the Teapot Dome scandal of the Harding administration. 43 Stat. 16 (1924).

**47.** Senator Ervin once introduced a bill that would have taken the Department of Justice out of the Executive Branch and made it independent (although even that bill would have re-

At bottom, then, the statute's necessity must be predicated on Congress' concern that a personally corrupt President would be reluctant to attack malfeasance within his own administration. The Watergate crisis is, of course, the statute's genesis and it is in order to spare the country a repetition of that "long national nightmare" that the statute has been enacted. That justification assumes, wrongly we think, that prosecuting Presidents can somehow be made relatively painless. We do not see how such an eventuality can, no matter what structural techniques are employed, be other than a national nightmare.

The Framers were not oblivious to the concerns that gave rise to this legislation. By providing Congress with the impeachment power, and declining to extend the President's pardon power to cases of impeachment, the Constitution grants to Congress the power, if needed because of criminal behavior, to discipline the President and all of his appointees. The impeachment clause and the limitation on the President's pardon power not only demonstrate that the Framers did not ignore the problem of wrongdoing in high places; these provisions further suggest that the balance between the need for official accountability for criminal acts and the prerogative of the President to oversee the execution of the laws was struck in the Constitution itself. Although the power to impeach has been used only sparingly, it has been explicitly directed against two Presidents. More importantly, however, it hangs over the Executive Branch as a brooding omnipresence, often forcing Presidents to take action that they might wish to avoid. After President Nixon caused one special prosecutor to be discharged the resulting uproar—and the explicit threats of impeachment—compelled him almost at once to acquiesce in the appointment of another, who was given full authority to pursue criminal charges against the President himself.

As did the Supreme Court in *Myers*, 272 U.S. at 164–67, 175, 47 S.Ct. at 41–42, 45, we note that the legislation before us was passed in the midst of a period when one political party tended to control the Presidency and the other enjoyed dominance in the Legislative Branch. It is of course conceivable, without in the slightest degree impugning congressional motives, that this long-standing political division has subtly contributed to the inevitable tension between the political branches and thus perhaps played a role in the perceived need for this legislation. Ironically, however, the impeachment power is a good deal more credible threat when Congress is controlled by one party and the Presidency by the other. Certainly history bears out that observation. That means the Act may well have been passed at a time in American history when its need, even assuming the validity of its defenders' positions, was least.

The dissent ostensibly does not accept the independent counsel's necessity argument. Dissent at 528 n. 28. Our colleague suggests rather that since the Watergate abuses amounted to an effort by the President to alter the balance of power between the Presidency on the one hand and Congress and the Judiciary on the other, Congress is entitled to respond. The dissent does not explain in what manner these abuses "threatened the balance among the three branches of government," Dissent at 527, but, in any event, we would have thought the denouement of the Watergate affair hardly suggests the triumph of the Presidency over the other two branches. Furthermore, to say, as does the dissent, that the Act is constitutional since "no man can be a prosecutor or judge in his own case" and the Act merely "maintain[s] the executive's proper—and properly circumscribed—constitutional role," *id.* at 527, is either to accept the necessity argument or to assume the conclusion in this case.

Even were we persuaded that the legislation's "necessity" were great, however, we could not approve such a fundamental revision to our constitutional scheme. Congress itself seems to have been implicitly aware that the Act was designed to correct what it thought was a constitutional defect.

tained presidential appointment authority). S. 2803, 93d Cong., 1st Sess. (1973).

The Senate Committee Report, cited by the independent counsel herself, suggests exactly that: "The Committee believes that the dangers of conflict were not unique to Watergate, but rather are *inherent* in our system of government." S.REP. No. 496, 97th Cong., 2d Sess. 4 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3537, 3540 (emphasis added). Inherent indeed! The conflict of interest, such as it is, is found in the Constitution itself.[48] That is of course what we mean when we refer to the inherent qualities of our governmental structure. And " 'the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government....' " *Bowsher v. Synar*, 106 S.Ct. at 3193–94 (quoting *Chadha*, 462 U.S. at 944, 103 S.Ct. at 2780). The Supreme Court has not hesitated to hold laws or executive actions unconstitutional on separation of powers grounds, even when the actions taken or laws passed were in response to pressing national crises. *See, e.g., Bowsher*, 106 S.Ct. 3181; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). In the end, the necessity argument fails because it is radically inconsistent with decisions taken at the beginning of our nation. As the Court said in *INS v. Chadha*, 462 U.S. at 959, 103 S.Ct. at 2788 (citation omitted):

> The choices we discern as having been made in the Constitutional Convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. There is no support in the Constitution or deci-

sions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit constitutional standards may be avoided, either by the Congress or by the President. With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.

Congressional desire for more effective administration of the criminal law when high governmental officials are implicated cannot justify departure from a constitutional plan carefully calibrated to balance the need for law enforcement against concerns for individual liberty.

Next, the independent counsel suggests that this statute, unlike the statutes considered in *Chadha* and *Bowsher*, even if it encroaches upon executive authority, should be sustained because it does not explicitly add to Congress' powers. That portion of Executive Branch authority that is removed from presidential control does not, it is argued, directly enhance congressional authority. It is quite true that the Framers seemed most troubled by the prospect of a too powerful Congress. "[T]he debates of the Constitutional Convention, and the Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches." *Bowsher*, 106 S.Ct. at 3189. And it is also true that Congress' role under the Act is limited to a non-binding call for the appointment of an independent counsel and the right to receive reports from that office. As has been previously suggested, however, "[u]nhitching the Independent Counsel from the executive may make the office naturally prone to domination by the branch that represents

---

**48.** That each branch enjoys power to favor itself as against other branches is endemic to our constitutional structure. The judiciary, for instance, cannot avoid passing on questions that directly affect its status and even its compensation. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980). And the Congress typically legislates restrictions on conduct of Executive Branch officials yet exempts itself from those restrictions. *See, e.g.,* 42 U.S.C. § 2000e–16(a) (1982) (employment discrimination law applies to Executive Branch officials but is not extended to all congressional employees).

its primary competitor." *In re Sealed Case*, 829 F.2d at 65 n. 3 (Williams, J., concurring and dissenting).

But whether or not Congress can actually exercise subtle influence over, or give implicit direction to, an independent counsel, it seems simplistic to contend that Congress' political power in our system is unaffected by a diminution (or increase) in the Chief Executive's authority. If the President's authority is diminished—and we think it utterly impossible to deny that the Act accomplishes at least that result—Congress' political power must necessarily increase vis-a-vis the President. In practical terms, repeated calls for the appointment of a statutory independent counsel may, like a flicking left jab, confound the Executive Branch in dealing with Congress. An actual appointment, furthermore, surely saps the political vitality of the Presidency and thereby renders the President a less effective political force juxtaposed against Congress. In this very case, congressional calls for appointment of an independent counsel to investigate Executive Branch withholding of documents—based on executive privilege—seem to have been only a part of a broader, and not atypical, struggle between the political branches over the expenditures of appropriated funds in the shadow of an impending election. Of course those demands could occur in the absence of the statute, but the Act, by imposing a legal obligation (even if unreviewable by the courts, *see Banzhaf v. Smith*, 737 F.2d 1167 (D.C.Cir.1984) (en banc) (per curiam)) upon the Attorney General to seek an independent counsel if certain rather minimal conditions are met, surely alters the political equation.

Be that as it may, whether the effect of the Act is to transfer power to Congress is not determinative as to its constitutionality. The dissent, relying on *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), contends that a "more fluid, functional approach" rather than a formalistic analysis is called for if—as is claimed is true here —a statute siphons off from one branch but does not transfer to another. We have difficulty understanding why that principle, even if correct, would apply to this case, since, as we show, many of the Executive Branch functions have been quite explicitly transferred to the Special Court—a part of the Judicial Branch. But, in any event, we think the dissent overreads *Schor*. There the Court upheld a statutory scheme whereby a litigant before an independent adjudicatory agency, the Commodity Futures Trading Commission ("CFTC"), could bring a state common law counterclaim in a reparation proceeding pursuant to the Commodity Exchange Act. Prior opinions regarded adjudication of state common law claims as more obviously implicating Article III jurisdiction than did the adjudication of "public rights" claims. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67–70, 102 S.Ct. 2858, 2869–71, 73 L.Ed.2d 598 (1982). The Court in *Schor* allowed what perhaps had been thought to be exclusively Article III cases to be tried *in the first instance* before the administrative agency at the option of both parties. The judiciary, however, did not thereby give up any real power or prerogative; CFTC orders may only be enforced by a federal district court, where they are subject to a non-deferential standard of review (which is another way of describing supervision). That is why the Court thought the magnitude of any intrusion on the Judicial Branch "*de minimis.*" *Schor*, 106 S.Ct. at 3260. In sharp contrast, the Ethics in Government Act's purpose and effect are to deprive the President of *any* supervisory role over the independent counsel.

We think *Young v. United States ex rel. Vuitton et Fils S.A.*, —— U.S. ——, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)—upon which, paradoxically, the independent counsel relies—is more revealing as to how the Supreme Court treats a significant threat to a branch's power. As we have discussed, *see supra* pp. 495–96, the Court there concluded that judicial authority to initiate contempt proceedings was an inherent judicial prerogative, else "the judicial power of the United States would be a mere mockery." *Id.* 107 S.Ct. at 2131. If denying the judiciary's authority to initiate

prosecutions for out of court contempts would make a mockery of judicial power, it surely can also be said that to deprive the President of all the Act does makes executive power a mere mockery.[49]

Finally, we are told by the independent counsel and supporting amici that only a small fraction of the President's authority is taken from him by the Act. We have had, however, and indeed now have, a considerable number of these independent counsel employing what appear to be sizeable staffs. We are not at all confident therefore that we could measure, if we thought it decisive, just how much presidential authority in terms of the number of investigations, actual or potential, is at stake in this case. We think the question irrelevant, however, because the independent counsel's argument ignores the primary purpose of the Constitution's deliberate separation of powers. It is not the quantity of cases or investigations withdrawn from executive supervision that is important, for a qualitatively significant encroachment upon the executive's control over even a single case may have a drastic impact on the individual involved. The constitutional doctrines implicated by this case do not concern merely questions of governmental organization and structure, but rather involve checks and balances that were designed "to protect the people from the improvident exercise of power." *Chahda,* 462 U.S. at 957, 103 S.Ct. at 2787. Separation of powers was considered by the Framers to be an "essential precaution in favor of liberty." THE FEDERALIST No. 47 at 323 (J. Madison) (J. Cooke ed. 1961). "The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher,* 106 S.Ct. at 3191. That theme is repeated in *Schor,* where the Court, focusing on Article III, recognized

that an independent judiciary serves both institutional and personal interests, but the latter is the more important. *Schor,* 106 S.Ct. at 3256. Personal interests were not infringed by the statute upheld there because not a single litigant was obliged to have his common law claim adjudicated by the CFTC—the scheme was purely voluntary. One of appellant's counsel well expressed the essence of this concept: "If you look from the top down, as opposed to the bottom up, the chief defense of the statute of the independent counsel is it is only a little bit of executive power that is being taken away. If you look from the bottom up, from the accused person up ..., all that accused person's protection that he was getting through three separate branches is taken away...."

That very independence from presidential and Justice Department supervision and guidance that Congress deliberately fashioned for independent counsel has troubling consequences for those who find themselves the target of the independent counsel's attention. A person occupying this statutory office has, it seems to us, unique incentives to seek an indictment.[50] Our concern is based on the self-evident proposition that the whole *raison d'etre* of the independent counsel is not to administer the criminal law across a wide population, but rather to focus on one individual or group of individuals targeted at the inception of the office. In effect, an entire self-sufficient government agency is created from scratch to investigate and perhaps prosecute a single individual. The need to justify even the expense of an office dedicated solely to one goal must generate a reluctance to decide against indictment or to conclude the investigation absent near certainty that no indictment is possible or that no further leads remain.

---

**49.** Otherwise *Vuitton* would stand for only a self-serving principle of "judiciary über alles."

**50.** We do not refer primarily to economic incentives—the independent counsel and her staff remain on the government's payroll only so long as an investigation or prosecution is in progress. Most persons who occupy that office full time would, as is true with other senior government appointees, suffer a diminution in

income. *But cf. Tumey v. Ohio,* 273 U.S. 510, 524, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) ("[I]n analogous cases it is very clear that the slightest pecuniary interest of any officer, judicial or quasi-judicial, in the resolving of the subject matter which he was to decide, rendered the decision voidable." (citing *Bonham's Case,* 8 Coke, 118a)).

And inevitably, the success of the office itself, in the public's eyes, at least, must turn to some extent upon whether indictment and conviction are obtained. The independent counsel is thus "subject to formidable public—and perhaps self-imposed—pressure to indict in the one case he was appointed to pursue." [51]

These incentives to prosecute might be thought also to affect a special prosecutor appointed by the Attorney General or the President. But, under the Act the independent counsel enjoys *statutory* immunity from supervision by anyone else in the Executive Branch and thus, unlike a special prosecutor appointed by the Attorney General and subject to his potential supervision, is free to ignore considerations normally included within the rubric of prosecutorial discretion and which may in a particular case all point to restraint. We have already mentioned powerful executive policy concerns, such as the foreign relations of the United States, that quite legitimately could influence the executive not to seek an indictment in a given case. More fundamental, perhaps, the independent counsel has no need to view a particular case in relation to similar cases, past or future. Wise exercise of prosecutorial discretion is dependent in part upon access to officials who are participants in the ongoing process of enforcing the law and who are able to take a longer view of an individual case. Yet the independent counsel is cut off from the accumulated lore and wisdom of career Department of Justice officers, who are in a unique position to evaluate "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte*, 470 U.S. at 607, 105 S.Ct. at 1530. These factors will often counsel against prosecution; a case that seems strong and important when viewed in isolation may look weak or trivial when measured against past cases or in relation to broader considerations of sound deployment of prosecutorial resources.[52]

An independent counsel is not required to follow Department of Justice policies, and so, on her own and unsupervised, decides matters as sensitive as what level of confidence in the prosecutor's mind regarding the target's guilt is sufficient before an indictment may properly be sought. Lawrence Walsh, the independent counsel in the Iran/Contra investigation, for example, has suggested that if he finds probable cause to believe that a crime has been committed, he has a duty to prosecute.[53] Probable cause is that low standard of confidence thought sufficient to support the issuance of a search warrant or an arrest warrant. The standard governing United States Attorneys' prosecutorial determinations, on the other hand, is much higher—it is the policy of the Department of Justice that as a matter of "fundamental fairness" an indictment should not be sought unless the prosecutor believes that an *unbiased* jury would convict, a standard which provides far greater protection than probable cause against the possibility that the target of an investigation will be unnecessarily subjected to a lengthy and expensive ordeal. U.S. Attorneys' Manual § 9-27.220 (June 15, 1984). Perhaps a less stringent standard may be justified in particular cir-

**51.** *Provision for Special Prosecutor: Hearings Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 30 (1976) (prepared statement of Hon. Edward H. Levi, Attorney General).

We do not impugn the motives of this or any other independent counsel by describing the peculiar incentives to prosecute and the absence of countervailing constraints. We note, however, that the Constitution was not written by men who believed that the security of society would be well guarded by trust in the integrity of public officials. Our own life-long tenure was surely motivated by a fear of weak judges who would decide cases with an eye toward those who could otherwise remove them.

**52.** It is of course possible that a given defendant might claim that he would be tactically advantaged if prosecuted by an independent counsel rather than by the Justice Department. That eventuality merely emphasizes the Act's uneven application of the law and it surely does not undermine appellants' claim.

**53.** L. Walsh, Remarks at the Prayer Breakfast of the American Bar Association (August 9, 1987) (Exhibit No. 10 to Brief of Appellants).

cumstances, but it is inconsistent with the doctrine of a unitary executive that under the independent counsel statute the target of an investigation may be exposed to less protection than if investigated by a United States Attorney, while the President and the Attorney General or for that matter any other politically accountable officials are powerless to affect the independent counsel's choice of the standard for prosecution.[54] The President "may properly supervise and guide [his officers'] construction of the statutes under which they act in order to secure that unitary and *uniform* execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Myers*, 272 U.S. at 135, 47 S.Ct. at 31 (emphasis added).[55]

\*   \*   \*   \*   \*   \*

We therefore conclude that the Act viewed as a whole, taking into account its appointment, removal, and supervisory provisions, so deeply invades the President's executive prerogatives and responsibilities and so jeopardizes individual liberty as to be unconstitutional.

## V.

■ The last basis upon which the Act is challenged is that it invests an Article III court with non-Article III powers. The constitutional principle of separation of powers may be violated in either of two ways. "One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. Or, the principle is alternatively violated when one branch assumes a function that more properly is entrusted to another." *Chadha*, 462 U.S. at 963, 103 S.Ct. at 2790 (Powell, J., concurring in judgment) (citations omitted). By removing a core executive officer from the control of the Executive Branch, the Act, as we have concluded, interferes with the executive's "performance of its constitutionally assigned function." Considered from a different viewpoint, though, the Act violates the separation of powers doctrine because it entrusts a court with an executive function, which a court may not constitutionally undertake. These defects are reciprocal in nature; the Act impermissibly takes a central responsibility from the Executive Branch in violation of Article II, and it impermissibly gives that executive responsibility to the Judicial Branch, thereby violating Article III. The latter defect would not appear if, for example, the Act placed the responsibility to supervise the independent counsel in the Speaker of the House of Representatives, although such a statute would have constitutional problems of its own. *See Bowsher*, 106 S.Ct. 3181.

Article III of the Constitution limits the judicial power of the United States to "Cases" and "Controversies." Federal courts therefore must " 'carefully abstain from exercising any power that is not strictly judicial in its character, and which is not clearly confided to [them] by the Constitution.' " *Muskrat v. United States*, 219 U.S. 346, 355, 31 S.Ct. 250, 253, 55 L.Ed. 246 (1911) (citation omitted). The "case or controversy" limit "defines the

---

**54.** As we have held, the Attorney General independently granted Mr. Walsh authority to conduct the Iran–Contra investigation and, therefore, presumably retained the power, by modifying the regulation, to control such matters. *In re Sealed Case*, 829 F.2d 50 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988). We refer to Mr. Walsh's "probable cause" standard because it affirms our view of the incentives and disincentives that affect an independent counsel. In the present case there can be no question that the Attorney General lacks authority to influence the independent counsel's prosecutorial determination.

**55.** The dissent claims that the Framers did not anticipate a "centralized federal prosecutorial corps," Dissent at 526 n. 22, thus suggesting that they were unconcerned with the "problem of uneven application [of the law]" we refer to here. But bureaucratic form is not determinative; it matters not that the early United States Attorneys were within or without a particular department. What is important is that, from the very beginning, they were appointed by the President with the advice and consent of the Senate, and were removable by the President. *See* 1 Stat. 92 (1789). This gave the President the means to give direction to, and control, these officers, *see The Confiscation Cases*, 74 U.S. (7 Wall.) 455 (1868), and thus to achieve a "steady administration of the laws," which certainly was contemplated by the Framers. *See* THE FEDERALIST No. 70, at 471 (A. Hamilton) (J. Cooke ed. 1961).

'role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government.'" *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 749 (1980) (quoting *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968)). It also preserves an independent and neutral judiciary, relatively removed from the decisions and activities of the other two branches. Discharging tasks other than the deciding of cases and controversies would "involve the judges too intimately in the process of policy and thereby weaken confidence in the disinterestedness of their judicatory functions." F. Frankfurter, *Advisory Opinions,* in 1 ENCYCLOPEDIA OF THE SOCIAL SCIENCES 475, 478 (1930); *see also Glidden Co. v. Zdanok,* 370 U.S. 530, 582, 82 S.Ct. 1459, 1489, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J.).

Granted, the appointments clause of Article II bestows upon the judiciary unquestioned authority that it might not otherwise enjoy, given the circumscribed nature of Article III, to appoint, pursuant to appropriate legislation, at least those who support judges in the exercise of their Article III functions—clerks, secretaries, magistrates, and the like. It seems obvious to us, however, that this clause cannot be construed so as to undermine or nullify Article III limitations.

The Special Court under the Act not only appoints the independent counsel, it defines the jurisdiction of the independent counsel, it receives reports from the independent counsel, and it is authorized to terminate the office of the independent counsel "on its own motion ... on the ground that the investigation of all matters within the prosecutorial jurisdiction of the independent counsel ... have been completed or so substantially completed that it would be appropriate for the Department of Justice to complete such investigations and prosecutions." 28 U.S.C. § 596(b)(2). Since these provisions necessarily involve the Special Court in the non-Article III task of supervising the day-to-day activities of an Executive Branch official we hold them unconstitutional.

In *Hobson v. Hansen,* 265 F.Supp. 902 (1967), a special three judge federal district court considered a constitutional challenge to a law providing that members of the District of Columbia school board be appointed by United States district court judges sitting in the District of Columbia. Although its decision upholding the law, as we have noted, rested on a more narrow ground, the court did proceed to discuss the appointments clause of Article II, finding in it an additional grant of authority to courts to make appointments. The court, however, carefully distinguished power to appoint an executive officer from power to undertake other administrative duties relating to that officer's performance: "Were the judges authorized to administer the schools, even though our District Court is an Article I as well as an Article III court, there would have been 'such incongruity in the duty required as to excuse the courts from its performance or to render their acts void.'" *Id.* at 913 n. 14 (quoting *Ex parte Siebold,* 100 U.S. at 398). The distinction found in *Hobson v. Hansen* between the power to appoint and the power to administer is an obvious one.[56] Appointment is a one time only task, and does not require the appointing body to supervise or otherwise become entangled in the activities of the appointed official. So, even if under the authority of the appointments clause of Article II a court may constitutionally appoint an executive officer, when an Article III court is called upon to supervise and administer the executive office, constitutional bounds are transgressed. *See Buckley,* 424 U.S. at 123, 96 S.Ct. at 684; *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1852); *Hayburn's Case,* 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792).

Under the Act, once the Attorney General applies to the Special Court for appointment of an independent counsel, the Special

---

**56.** We fail to see the relevance, as a matter of constitutional law, of the distinction our dissenting colleague offers between administration and supervision. Dissent at 520 n. 5.

Court must "appoint an appropriate independent counsel and shall define that independent counsel's prosecutorial jurisdiction." 28 U.S.C. § 593(b). During the investigation the independent counsel may on her own motion apply to the Special Court "to refer matters related to the independent counsel's prosecutorial jurisdiction." 28 U.S.C. § 594(e). Accordingly, "[t]he court's responsibility in defining the prosecutorial jurisdiction of an existing special prosecutor is a continuing one." S.REP. No. 170, 95th Cong., 2d Sess. 65 (1977). As we noted, during the investigation in the case at bar, the independent counsel petitioned the Special Court for referral of additional matters. *See In re Olson*, 818 F.2d 34 (D.C.Cir.Indep.Couns.Div.1987). In its answer to that petition, the Special Court "interpreted" the independent counsel's original grant of jurisdiction to allow the independent counsel to investigate whether Olson had conspired with Schmults or Dinkins despite the fact that the Justice Department had previously found no reasonable ground to investigate this charge. *Id.* at 47–48. Guidance regarding the scope of an executive official's duty undeniably is a typical supervisory function; in this case the court's guidance was actually opposed to that which the Executive Branch gave.

While the Attorney General has, as a matter of practice, included as part of the application for the appointment of the independent counsel a statement of suggested jurisdiction, the Act does not mandate that he do so; it requires only that the Attorney General provide "sufficient information to assist the division of the court to select an independent counsel and to define that independent counsel's prosecutorial jurisdiction." 28 U.S.C. § 592(d)(1). Nor has the Special Court treated the Attorney General's statement of suggested jurisdiction as binding, and neither the statute nor the legislative history of the Act suggests that it should.[57] In another independent counsel investigation that has been before this court, the Iran/Contra investigation, *see In re Sealed Case*, 827 F.2d 776 (D.C.Cir.1987) (per curiam), the Special Court defined the independent counsel's jurisdiction to include more events and persons than those included in the Attorney General's application. *See In re Oliver L. North*, No. 86–6 (D.C.Cir.Indep.Couns.Div. Order filed Dec. 19, 1986). That decision had obvious political and foreign policy overtones. The Special Court's action followed receipt of a letter from the Democratic members of the Senate Judiciary Committee requesting that the jurisdiction of the independent counsel be expanded to include an investigation into the provision of support for forces fighting the government of Nicaragua. *See In re Sealed Case*, 829 F.2d 50, 65 n. 3 (D.C.Cir.1987) (Williams, J., concurring and dissenting). The Special Court's determination to grant this jurisdiction to the independent counsel (albeit subsequently ratified by the Attorney General) was not made in the context of a case or controversy; no public hearing or notice to the parties involved preceded the decision. Even if the parties had been before the court, the presence of adversaries with a personal stake in the matter does not, contrary to the dissent's suggestion, Dissent at 38, convert a policy dispute into an Article III case or controversy. *Keller v. Potomac Elec. Co.*, 261 U.S. 428, 48 S.Ct. 445, 67 L.Ed. 731 (1923). Like many other executive decisions, the determination of jurisdiction in both the *North* and *Olson* proceedings was made in the context of swirling controversy in which various factions hoped for opposing outcomes and the decisions necessarily rested on indeterminate considerations of policy and on information brought to the decisionmaker's attention through various avenues, including *ex parte* communications.

Definition of a prosecutor's jurisdiction is, of course, crucial to the whole enterprise of executing the criminal law, for in practical terms, it determines who may be sub-

---

**57.** The Senate Report on the Act states that "even if the Attorney General should not request that related matters be assigned to an existing special prosecutor, the court has the authority to do so...." S.REP. No. 170, 95th Cong., 2d Sess. 65 (1977), U.S.Code Cong. & Admin.News 1978, p. 4281.

ject to prosecution and for what crimes.[58] Deciding to target certain people and certain acts, and to exclude others, necessarily involves a balancing of factors and a setting of priorities that have uniformly been held to be beyond the province of the judiciary. *See, e.g., Wayte,* 470 U.S. at 607, 105 S.Ct. at 1530; *Heckler v. Chaney,* 470 U.S. at 831, 105 S.Ct. at 1655; *Newman v. United States,* 382 F.2d 479, 480–81 (D.C. Cir.1967). These decisions may not generally even be reviewed by a court, *id.* at 480–82, and yet the Act requires the Special Court to make them in the first instance. Where there is no law to apply and where a decision necessarily involves a paradigmatic political choice to allocate societal resources one way rather than another, a court must inevitably act "under compulsions and motives that have no relation to performance of our Art. III functions." *Vermont v. New York,* 417 U.S. 270, 277, 94 S.Ct. 2248, 2252, 41 L.Ed.2d 61 (1974) (per curiam).

That is not all. When independent counsel have become concerned about whether the federal conflict-of-interest laws apply to them, they have approached a member of the Special Court in his chambers and sought his advice on this issue.[59] In response, the Special Court has issued "orders" that purport to exempt the independent counsel and the staff of the independent counsel from conflict-of-interest laws.[60] And in another case, the Special Court ordered an independent counsel to delay an investigation of certain allegations until completion of related state criminal proceedings. H.R.CONF.REP. NO. 452, 100th Cong., 1st Sess. at 26 (1987). Again, it is important to note that such orders were not given in the context of a case or controversy; no notice was given to interested parties and no hearing was held or briefs filed. It seems more than a bit artificial to place the issuance of such orders into the category of accepted judicial duties. For all effects and purposes these were instructions given by a superior to an executive officer under his supervision, a task which Article III does not contemplate as judicial.

Finally, we turn to the Special Court's "removal" power. In *Bowsher v. Synar,* the Supreme Court struck down a law that vested executive power in an officer who was removable by a joint resolution of Congress. Discussing the relationship between the power to remove and the power to control, the Court said:

> To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws.... "Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey."

106 S.Ct. at 3188 (quoting *Synar v. United States,* 626 F.Supp. at 1401). Potential for control is not, as we saw in *Bowsher,* contingent on removal power that is direct and unlimited. Congress' power to remove the Comptroller General, from which the Su-

---

**58.** We reject the argument of the independent counsel that the power to define her jurisdiction is a "necessary incident" of the power to appoint. Her argument would allow Congress to abrogate Article III case or controversy limitations by the simple expedient of vesting appointment power in the courts. Even under the independent counsel's broad conception of the court's power to make appointments, it does not follow that they may perform other, more extensive executive tasks. *See Hobson,* 265 F.Supp. at 913 n. 14.

Nor does the "necessary and proper" clause, as the independent counsel and the Special Court itself, *see In re Olson,* 818 F.2d at 44, assert, authorize Congress to assign non-judicial duties to courts in contravention of Article III. *See Buckley,* 424 U.S. at 135, 96 S.Ct. at 688.

**59.** *See Hearings Before the Subcomm. on Admin. Law and Governmental Relations of the House Comm. on the Judiciary,* 100th Cong., 1st Sess. 6–7 (1987) (prepared statement of Hon. George E. MacKinnon, Senior Circuit Judge, United States Court of Appeals for the District of Columbia Circuit) (legislative history unavailable prior to release of this opinion; statement referred to in Brief of Amicus Curiae Michael K. Deaver).

**60.** *See In re Michael K. Deaver,* No. 86–2 (D.C. Cir.Indep.Couns.Div. Order filed July 2, 1986); *In re Theodore B. Olson,* No. 86–1 (D.C.Cir.Indep.Couns.Div. Order filed June 18, 1986).

preme Court inferred congressional control over that officer, was a good deal more circumscribed than the Special Court's power to remove the independent counsel. In *Bowsher*, congressional removal authority was restricted by a for cause provision, the check of bicameralism, and the possibility of an executive veto. In addition, there was a sixty year tradition of the Comptroller General's independence; no Comptroller General had ever been removed by Congress. Nevertheless, the Court found that this relatively constrained—perhaps more theoretical than real—removal power created too great a danger of congressional interference with executive functions to withstand a separation of powers challenge.

Here the Special Court (consisting not of 100 Senators and 455 House members but only three judges) may in effect abolish the office of the independent counsel whenever two of the judges believe her investigation no longer serves a useful purpose. 28 U.S.C. § 596(b)(2). Authority to terminate, perhaps abruptly, the entire office, to disavow all the independent counsel's efforts and halt ongoing proceedings appears to us, if anything, to be greater power than the right merely to remove one independent counsel. On the other hand, should the Special Court wish in effect to discharge what it believes is a "runaway" independent counsel and yet ensure that ongoing investigations or prosecutions continue, it has authority under the Act to turn the work of the independent counsel back to the Justice Department by finding that her efforts are "substantially completed." *Id.* This Special Court then holds over the head of the independent counsel both the broadsword and the rapier to control the pace and depth of the independent counsel's activities.

As all who have borne the responsibility of criminal investigation well know, there is no such thing as a perfect investigation. More leads can always be pursued, more

facts can always be discovered, more witnesses can always be interviewed; therefore, a wise determination that an investigation should end is a subtle one often requiring as much self-confidence and courage as close legal analysis. That responsibility, like the initiation of an investigation through appointment of the independent counsel and the definition of its scope (jurisdiction), is the very essence of prosecutorial discretion. These powers and responsibilities are here all combined in the Special Court, whose exercise of them is, moreover, unreviewable.[61] In *Bowsher*, the President at least retained the appointment power and some check, through the veto power, on removal. And, it will be recalled, removal of the Comptroller General was arguably subject to judicial review. *See Bowsher*, 106 S.Ct. at 3190.

The independent counsel's contention that all these duties are not dissimilar to the responsibilities of an Article III court when it is obliged to find probable cause before issuing a search warrant or when it rules on matters concerning grand juries is wholly unpersuasive. The Bill of Rights refers to both search warrants and grand juries, and since the earliest days of the Republic it has been assumed that judges may play a role in each. *See generally Brown v. United States*, 359 U.S. 41, 49–52, 79 S.Ct. 539, 545–47, 3 L.Ed.2d 609 (1959). Indeed, since the grand jury referred to in the Fifth Amendment is the grand jury as it existed at common law, and since that grand jury was traditionally overseen by a judge, it is fair to conclude that the Constitution implicitly requires that judges assume the role they do in a grand jury proceeding. That includes summoning witnesses to attend and give testimony, as well as using the court's contempt power to punish recalcitrant witnesses. *Id.* But even if this were not so, the authority that the Special Court exercises over the independent counsel, particularly with respect to the scope of the indepen-

---

**61.** The Ethics in Government Act does not provide for review of a decision by the Special Court to terminate the office of the independent counsel, although it does provide for judicial review if the Attorney General removes the in-

dependent counsel. The clear implication, it seems to us, is that Congress did not intend the Special Court's removal decision to be subject to review.

dent counsel's investigation, is far greater than and qualitatively different from the role of a federal judge vis-a-vis a grand jury. The judiciary is, under the Act, implicated directly in Executive Branch policy judgments—a judge cannot insist that a grand jury investigate a particular person or incident, yet under the independent counsel statute the Special Court has just that power over the independent counsel.[62]

Similar arguments are made in the amicus brief from the United States House of Representatives, which asserts that since a prosecutor is an officer of the court who works in and about the courts and who is subject to court rulings and instructions there can be no impropriety in the Special Court's appointment and supervision of the independent counsel. This argument has previously been squarely rejected by this court. In *Newman v. United States*, 382 F.2d 479, 481 (D.C.Cir.1967) (emphasis added), then-Judge Burger said of the United States Attorney:

> He is at once an officer of the court and the agent and attorney for a client; in the first capacity he is responsible to the Court for the manner of his conduct of a case, *i.e.*, his demeanor, deportment and ethical conduct; but in his second capacity, as agent and attorney for the Executive, *he is responsible to his principal and the courts have no power over the exercise of his discretion or his motives as they relate to the execution of his duty....*

Intimate involvement of an Article III court in the supervision and control of a prosecutorial office undermines the status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government. From the inception of this nation the crucial importance of a neutral judiciary has been repeatedly emphasized. Madison wrote, concerning the dangers of mixing the judicial function with

other governmental roles, " '[w]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary controul, for *the judge* would then be *the legislator*. Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor*.' " THE FEDERALIST No. 47, at 326 (J. Madison) (J. Cooke ed. 1961) (emphasis in original) (quoting Montesquieu). Of the three branches, it is the role of the judiciary that the Constitution most clearly and tightly confines within narrow borders. Describing these constitutional limits, Madison said "the executive power being restrained within a narrower compass, and being more simple in its nature; *and the judiciary being described by landmarks, still less uncertain*, projects of usurpation by either of these departments, would immediately betray and defeat themselves." THE FEDERALIST No. 48, at 334 (J. Madison) (J. Cooke ed. 1961) (emphasis added). This careful delineation of the Judicial Branch's appropriate role serves both to guard against the danger of judicial tyranny feared by Madison and to preserve the courts as a neutral forum for the resolution of disputes. "Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between litigants, capable of effective determination." *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947).

The Act's inattention to Article III's limitations is particularly troubling because it implicates the course of a federal criminal investigation, which, if there were an indictment, must necessarily come before the federal courts for trial and, in all likelihood, appeal. In any such trial or appeal, the defendant may wish to call the court's attention to misconduct by the independent counsel or by the independent counsel's

---

**62.** We have already indicated that *Young v. United States ex rel. Vuitton et Fils S.A.*, —— U.S. ——, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), cannot be extended, as the independent counsel argues, to authorize a court to appoint and supervise a federal prosecution. *Vuitton* was limited to appointment of a private attorney *required* to prosecute violations of judicial or-

ders—this was regarded a judicial, as opposed to an executive, function. No party suggests that the Act's delegation to the Special Court of appointment and supervision of the independent counsel is a delegation of a judicial (Article III) function. Instead, it is defended on the authority of the appointments clause found in Article II.

superior, who, as we have shown, in practical terms is the Special Court. This can raise an obvious dilemma for a defendant who may be impelled to engage in subtle calculations concerning the possibility of offending the court by pointing too vigorously to alleged overreaching by fellow judges or by an officer appointed by and supervised by fellow judges. In this very appeal, appellants seem to have considered the possible influence of this court's respect for its colleagues in framing their arguments.[63] Appellants have delicately suggested—and we think rightly—that the Special Court's opinion in *In re Olson* was not only incorrect, but improper. Even though no party before it challenged the constitutionality of the Act, the Special Court purported to decide that issue, and did so in a proceeding in which the parties who actually were challenging the statute's constitutionality were not heard. To be sure, the Special Court's "denial" of the independent counsel's request for amended jurisdiction could properly rest on its desire to avoid constitutional problems (although issuing a "judicial opinion" to that effect seems dubious), but it was certainly gratuitous for the court to express its advisory view of the Act's constitutionality. The Ethics Act, after all, precludes judges on the Special Court from sitting on cases brought by independent counsel. 28 U.S.C. § 49(f). And yet the Special Court's opinion would seem designed to influence the outcome of those cases where targets of independent counsel were directly challenging the constitutionality of the Ethics in Government Act. Not surprisingly, its opinion was relied upon by the district court in this case. So we can well understand counsel's diffidence in challenging the activities of the Special Court. " 'The need to preserve judicial integrity is more than just a matter of judges satisfying themselves that the environment in which

they work is sufficiently free of interference to enable them to administer the law honorably and efficiently. Litigants and our citizenry in general must also be satisfied.' " *In re Application of President's Comm'n on Organized Crime*, 763 F.2d 1191, 1197–98 (11th Cir.1985) (quoting *Hobson v. Hansen*, 265 F.Supp. at 931 (Wright, J., dissenting)). The Act, then, is constitutionally defective not only because it gives courts powers beyond what Article III allows, but also because the powers given conflict with those that the Constitution entrusts in us.

\* \* \* \* \* \*

At the very core of this constitutional dispute lies the dual meaning of the word "politics." The Act's independent counsel provisions are designed in significant part to remove the influence of partisan politics from those prosecutorial decisions perceived as most vulnerable to partisan considerations. No one as a matter of principle can disagree with this general objective, whether as applied to those covered by the Act or, for that matter, as applied to all Americans subject to criminal and civil law. Politics however, as we and the Supreme Court have emphasized, also refers to quite legitimate governmental policy determinations—in this case Executive Branch policy determinations. Unfortunately, it is impossible through the device Congress chose to excise the former without encroaching upon the latter.

Mindful as we are of the distinguished array of legal talent and institutional authority asserting the constitutionality of the Ethics in Government Act, we come only soberly and not easily to our conclusion that the Act is unconstitutional. We have grappled with issues that we full well recognize divide the nation politically (using the word in the partisan sense), and federal judges—properly removed from

---

**63.** As one appellant's counsel said,

[w]e are here today talking about errors that were made not by such Executive Branch official, we say, not by the legislature, we say, but we are here to complain in part about errors which we say were made by members of this court, and there is some discomfort in that, to argue that to you, and I would suggest

that that discomfort is constitutionally based. And from my perspective, from the perspective of the accused, it is a kind of betrayal of the concept of an absolutely neutral judiciary who I can come to, who is not married to the prosecutor or who has no relationship to them.

Tr. of Oral Argument at 130.

any political considerations, partisan or policy—do not relish the task of deciding such issues. But great constitutional cases have often arisen out of the crucible of partisan struggle, *e.g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and we have no alternative but to apply our view of the Constitution. This is no abstract dispute concerning the doctrine of separation of powers. The rights of individuals are at stake.

RUTH BADER GINSBURG, Circuit Judge, dissenting:

The core of the constitutional issues presented in these consolidated cases is whether the independent counsel provisions of the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591–98 (1982 & Supp. III 1985) (Ethics Act or Act) violate the doctrine of separated government powers. There is an irony in the majority's holding that the Act is constitutionally infirm, for the measure strives to maintain the structural design that is the genius of our Constitution—the system of mutual checks and balances; the Act's sole purpose is to curb or avert abuses of executive branch power. Because I conclude that the Ethics Act neither impermissibly transfers an executive function to another branch nor orders an undue displacement of executive prerogatives, I would hold that the legislation withstands appellants' separation of powers challenges.

Appellants advance two less encompassing constitutional claims: that the Act contravenes the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2, and that it also violates the case or controversy requirement of Article III. These challenges are intertwined with the overarching separation of powers question; I find neither claim persuasive, whether considered separately or in conjunction with the larger challenge.

Finally, appellant Olson advances a statutory claim: that the Special Division incorrectly defined independent counsel's jurisdiction to include possible conspiracy charges against Olson in the absence of a specific request to that effect by the Attorney General. For the reasons set forth in part IV., I conclude that Olson's statutory claim is not ripe for this court's review.

Accordingly, I would hold the Ethics Act constitutional and affirm the judgments of the district court.

## I.

Appellants' separation of powers contentions build from the characterization of prosecution as an executive function; they advance three variants of the charge that the Act encroaches on this executive domain. One group of arguments clusters around the concept of aggrandizing one branch at the expense of another. A second avenue of challenge focuses on limitation; displacement of the constitutionally-assigned functions of one branch may undermine the structure of separated and balanced powers even absent an impermissible transfer or sharing of functions. Finally, appellants argue that the Act places impermissible constraints on the President's power to remove independent counsel. For the reasons stated below, none of these separation of powers challenges should succeed.

## A.

Appellants allege that the Act grants both the legislative and judicial branches impermissible roles in the conduct of prosecutions. They assert that the Act allows Congress to exert undue influence on law enforcement decisionmaking. Appellants also argue that the Act effectively transfers supervision of the prosecutorial function to the Special Division. Neither contention withstands scrutiny.

In *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the Supreme Court set forth the separation of powers analysis applicable to the question whether one branch has intruded impermissibly on the domain of another. The Court held that it is a violation of the "doctrine of separation of powers," *id.,* 106 S.Ct. at 3184, for Congress to charge the Comptroller General with the performance of executive functions, and at the same time to retain for itself the power to remove him.

The Court reasoned that the constitutional precept of divided and separated powers "does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts." *Id.* at 3187. Thus the *Bowsher* analysis proceeds in two steps. One first must characterize a given activity as legislative, executive, or judicial in nature. The inquiry then progresses to the question whether a different branch exercises supervision of, or control over, the identified function. *Bowsher* suggests that any such transfer of authority would be a violation of the separation principle.

The first step of the *Bowsher* analysis is unproblematic in this case. No participant in the litigation questions that prosecution is properly typed an executive branch function.[1] *See, e.g., United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Community for Creative Non-Violence v. Pierce,* 786 F.2d 1199, 1201 (D.C. Cir.1986); *United States v. Cox,* 342 F.2d 167, 171 (5th Cir.) (en banc), *cert. denied,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700

(1965). The second *Bowsher* question, whether the Act cedes control over prosecution to Congress or to the judiciary, requires more extended consideration.

Section 595(e) allows members of the Committee on the Judiciary of either House of Congress to request that the Attorney General apply for the appointment of an independent counsel.[2] The same section requires the Attorney General to respond to such a request, either by notifying the committee that he has made the requested application, or by stating why he decided not to apply. Appellants argue that this provision results in improper congressional influence on the process of prosecutorial decisionmaking. The objection is insubstantial.

Section 595(e) contains no language suggestive of an intent to give Congress the power to compel the Attorney General to apply for appointment of an independent counsel. The sole apparent purpose of the provision is accountability.[3] The Attorney General has discretion to decide whether to seek appointment of an independent counsel; if the decision is in the negative, he is not required to explain that decision in any detail.[4] This limited duty to give a reason

---

**1.** It is not necessarily a "core" executive function. *See infra* pp. 526–27.

**2.** 28 U.S.C. § 595(e) reads:

A majority of majority party members or a majority of all nonmajority party members of the Committee on the Judiciary of either House of the Congress may request in writing that the Attorney General apply for the appointment of [an] independent counsel. Not later than thirty days after the receipt of such a request, or not later than fifteen days after the completion of a preliminary investigation of the matter with respect to which the request is made, whichever is later, the Attorney General shall provide written notification of any action the Attorney General has taken in response to such request and, if no application has been made to the division of the court, why such application was not made. Such written notification shall be provided to the committee on which the persons making the request serve, and shall not be revealed to any third party, except that the committee may, either on its own initiative or upon the request of the Attorney General, make public such portion or portions of such notification as will not in the committee's judgment prejudice the rights of any individual.

**3.** A similar role is performed by the requirement of § 596(a)(2) that the Attorney General submit to the Special Division and to Congress a report regarding any decision to remove an independent counsel. The removal decision is subject to judicial review, *see infra* p. 522; unlike the decision whether to seek appointment of independent counsel, removal does not involve an exercise of prosecutorial discretion. *See also infra* p. 528 note 29.

**4.** If the reason for not appointing a special prosecutor is the fact that the matter is so unsubstantiated as to not warrant further investigation or prosecution, the Attorney General's explanation under this subsection need only state that fact. The Committee does not intend that the Attorney General go into any detail with regard to the basis for the decision made in the exercise of his prosecutorial discretion that a matter simply did not warrant any further investigation or prosecution after the conclusion of a preliminary investigation. S. REP. No. 170, 95th Cong., 1st Sess. 72 (1977), *reprinted in* 1978 U.S. CODE CONG. & ADMIN.NEWS 4216, 4288. I note here the clear understanding of Congress that under the Act as originally conceived and as renewed, the Attorney General's decision whether to request appointment of

for his decision is no more intrusive of executive branch prerogatives than the investigation challenged and upheld in *McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927). There the Supreme Court, though not addressing the separation of powers question directly, upheld a Senate select committee's subpoena directing the brother of a former Attorney General to testify before it. The subject of the committee investigation was

the administration of the Department of Justice—whether its functions were being properly discharged or were being neglected or misdirected, and particularly whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings to punish crimes and enforce appropriate remedies against the wrongdoers—specific instances of alleged neglect being recited.

*Id.* at 177, 47 S.Ct. at 46. It must be inferred that in the Court's view prosecutorial decisions were not to be kept in splendid isolation from congressional oversight.

Turning from legislative oversight to third branch participation, appellants contend that the several duties assigned to the Special Division under the Act render it, in effect, independent counsel's supervisor. In fact, the court's role is more administrative than supervisory.[5]

The Special Division cannot initiate an investigation or prosecution. § 593(b).

Upon application of the Attorney General it performs two functions in the appointment process: the court selects an individual to fill the position of independent counsel; and it defines that individual's jurisdiction, guided by the terms of the Attorney General's application. *Id.*

The Special Division has no supervisory role during independent counsel's tenure.[6] Should the Attorney General elect to remove an independent counsel pursuant to § 596(a)(1), the Special Division was formerly the forum in which independent counsel might seek review, § 596(a)(3),[7] and the Division retains authority to fill vacancies on the resignation, death, or removal of an independent counsel. § 593(e).

Upon completion of an investigation and/or prosecution, independent counsel must file a comprehensive report with the court. § 595(b)(1), (2). The Special Division also has the power to terminate an office of independent counsel on its own motion or at the suggestion of the Attorney General, on a finding that the assigned investigation is complete or substantially complete. § 596(b)(2). Each of the areas in which the Special Division exercises some degree of discretion presents an avenue of challenge for appellants.

The court's responsibility for selection of an individual to fill the independent counsel role does not, by itself, constitute an intrusion into the prosecutorial function. Courts frequently choose individuals to fill

an independent counsel is not subject to judicial review. *See* Independent Counsel Reauthorization Act of 1987, H.R. Conf.Rep. No. 452, 100th Cong., 1st Sess. 22 (1987) (except for Attorney General's decision to remove an independent counsel, "an Attorney General's determinations under the independent counsel law are not subject to judicial review").

5. I use the term "administrative" to refer to duties which include interpretation of the Act and the original grant of jurisdiction, but which do not involve the Special Division in the day-to-day supervision of independent counsel's investigative and prosecutorial activities.

6. The Division does have the duty to decide whether to refer "matters related to the independent counsel's prosecutorial jurisdiction" when such a request is made by independent counsel. *See* 28 U.S.C. § 594(e). This function may re-

quire clarification of the original jurisdictional grant, *cf. In re Olson,* 818 F.2d 34, 47–48 (D.C. Cir.Indep.Couns.Div.1987), but it does not involve examining the manner in which independent counsel conducts an investigation or prosecution within the limits of her jurisdiction, as a supervisor would do. Expansion of independent counsel's jurisdiction requires a request by the Attorney General. § 593(c).

7. Under the Independent Counsel Reauthorization Act of 1987, the forum for judicial review of the removal of an independent counsel is the United States District Court for the District of Columbia and no member of the Special Division may participate in the review proceedings. 28 U.S.C. § 596(a)(3) (as amended Dec. 15, 1987). The change is effective immediately. Independent Counsel Reauthorization Act of 1987, Pub.L. No. 100–191, § 6(b)(2)(F), 101 Stat. 1293 (1987).

vacancies in the corps of U.S. Attorneys, pursuant to 28 U.S.C. § 546.[8] Such appointments have been upheld against constitutional challenge. *United States v. Solomon,* 216 F.Supp. 835 (S.D.N.Y.1963). Under § 546, of course, the executive branch is free to replace the interim U.S. Attorney at any time. *Id.* at 842–43. Under the Ethics Act the court's choice is final, but it is a choice made only upon the request of the executive branch, and no court may review the Attorney General's decision not to request appointment of an independent counsel. *See supra* note 4.

The Act does not on its face require that the court's definition of independent counsel's jurisdiction track the Attorney General's application.[9] It cannot, however, be read to grant the Special Division unfettered discretion in this regard. Such a reading would be inconsistent with the preconditions of the court's jurisdiction-defining role: that the Attorney General conduct a preliminary investigation, § 592(a)(1), and that he provide "sufficient information to assist the division ... to define [an] independent counsel's prosecutorial jurisdiction." § 592(d)(1). It was expected that the Attorney General would provide relatively specific information:

> The prosecutorial jurisdiction can only be properly defined if the Attorney General provides complete and detailed information to the court about the true nature of the allegations of criminal wrongdoing,

any related criminal investigation which are [sic] presently being conducted by the Department, and any information or leads collected as a result of the preliminary investigation which would indicate the potential that further investigation will involve additional related matters.

S.Rep. No. 170, 95th Cong., 1st Sess. 56 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 4216, 4272. Congress gave the Special Division no anchor for its jurisdictional delineations other than the Attorney General's findings and recommendations; one cannot reasonably ascribe to the legislature a will to allow the Special Division to stride past the markers of the only investigation it has at hand. Since courts must interpret statutes in such a way as to give effect to all of their provisions, *see Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973),[10] the Act must be read to require the court's jurisdictional specification to be substantially as requested by the Attorney General.[11] The essential decision whether to proceed in a given direction toward potential prosecution, then, rests with the Attorney General, not the Special Division.

The termination provisions likewise present no problem of impermissible intrusion. The report submitted under § 595(b), upon independent counsel's termination of an investigation, generates no supervisory response from the court.[12] To the extent

---

**8.** 28 U.S.C. § 546 reads:
> The district court for a district in which the office of United States attorney is vacant may appoint a United States attorney to serve until the vacancy is filled. The order of appointment by the court shall be filed with the clerk of the court.

**9.** 28 U.S.C. § 592(d)(1) provides:
> Any application under this chapter shall contain sufficient information to assist the division of the court to select [an] independent counsel and to define that independent counsel's prosecutorial jurisdiction.

**10.** I note too the cardinal principle that courts construe statutes, whenever fairly possible, to avoid any constitutional conflict. *See, e.g., NLRB v. Catholic Bishop,* 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979).

**11.** *Accord In re Olson,* 818 F.2d 34 (D.C.Cir.Indep.Couns.Div.1987) (holding that Attorney Gen-

eral's decision not to refer certain matters to independent counsel precludes Special Division from making the same referral).

**12.** 28 U.S.C. § 595(b) reads:
> (1) In addition to any reports made under subsection (a) of this section, and before the termination of [an] independent counsel's office under section 596(b) of this title, such independent counsel shall submit to the division of the court a report under this subsection.
>
> (2) A report under this subsection shall set forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought, and the reasons for not prosecuting any matter within the prosecutorial jurisdiction of such independent counsel which was not prosecuted.
>
> (3) The division of the court may release to the Congress, the public, or to any appropri-

that *any* reporting requirement might create a degree of subservience on the part of the reporting officer, that effect is minimized here by the prior definition of independent counsel's jurisdiction. Any prosecutorial activity within the jurisdictional confines ultimately traceable to the Attorney General is insulated from the Division's scrutiny. Any decision by the Division to terminate an office of independent counsel, whether on its own motion or at the suggestion of the Attorney General, is similarly constrained by the jurisdictional grant.[13]

Time and statutory clarification have overtaken a further argument appellants put forward. They read former § 596(a)(3) as establishing a "judicial veto" over the Attorney General's decision to remove an independent counsel for cause because the section said the Special Division could order relief if the removal "was based on error of law or fact." *See* Brief of Appellants, Nos. 87–5261, 87–5265 (Appellants' Br. II) at 38–39.[14] This appellants took to mean that the Special Division was empowered to engage

in de novo review, thus construing the congressional product to provoke, not avoid, a constitutional controversy. *Cf. supra* p. 521 note 10. But Congress has clarified that it never intended application of any extraordinary or intense judicial review standard:

> the sentence which establishes the ["error of law or fact"] standard for courts to apply in reviewing the removal of an independent counsel from office. This standard was included when the statute was originally enacted as a reflection of existing law regarding officials subject to removal only for good cause. However, the conferees want to avoid any possibility that it would be viewed as having established a different standard. The intent of the statute as originally enacted, and as reauthorized, is that the courts should apply the standards established by existing case law on the removal of such officials.

Independent Counsel Reauthorization Act of 1987, H.R.CONF.REP. No. 452, 100th Cong., 1st Sess. 37 (1987).[15]

> The majority finds a similarity between the Special Division's power to terminate an office of independent counsel on its own motion and the removal provision at issue in *Bowsher.* Maj. Op. at 514–15. However, the legislative history of the Act makes it clear that the termination provision was intended to serve only as a measure of last resort, one to arrest a "runaway" independent counsel:
>
> > This paragraph provides for the unlikely situation where a special prosecutor may try to remain as special prosecutor after his responsibilities under this chapter are completed.... The drastic remedy of terminating the office of special prosecutor without the consent of the special prosecutor should obviously be exercised with caution.
>
> S.REP. No. 170, 95th Cong., 1st Sess. 75 (1977), *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 4216, 4291.

ate person, such portions of a report made under this subsection as the division deems appropriate. The division of the court shall make such orders as are appropriate to protect the rights of any individual named in such report and to prevent undue interference with any pending prosecution. The division of the court may make any portion of a report under this section available to any individual named in such report for the purposes of receiving within a time limit set by the division of the court any comments or factual information that such individual may submit. Such comments and factual information, in whole or in part, may in the discretion of such division be included as an appendix to such report.

**13.** *See* § 596(b)(2):

The division of the court, either on its own motion or upon suggestion of the Attorney General, may terminate an office of independent counsel at any time, on the ground that the investigation of all matters within the prosecutorial jurisdiction of the independent counsel or accepted by such independent counsel under section 594(e) of this title, and any resulting prosecutions, have been completed or so substantially completed that it would be appropriate for the Department of Justice to complete such investigations and prosecutions. At the time of termination, the independent counsel shall file the report required by section 595(b) of this title.

**14.** I recognize that appellants' deeper objection is to the imposition of *any* limitations on the President's power to remove independent counsel. That issue is addressed *infra* p. 528 at I.C.

**15.** I note, moreover, that even if it were arguable that the Act, prior to the 1987 reauthorization, empowered the Division to review a removal de novo, appellants here would have encountered a ripeness shoal. To claim that the prospect of de novo Division review of a removal would affect independent counsel's judgments

To summarize, taken as a whole, the Special Division's role is more administrative than supervisory. The Division's discretion is constrained at every juncture by the original grant of jurisdiction, itself defined in response to the Attorney General's application for independent counsel. The Division holds no control rein over the exercise of the independent counsel's prosecutorial discretion. Thus, there is no *transfer* of the prosecutorial function to the judicial branch of government.[16]

This is not to deny that the Act imposes limits on the executive. It calls upon the Attorney General to apply for independent counsel if his preliminary investigation, § 592(a)(1), of a possible violation of federal criminal law by a covered individual reveals "reasonable grounds to believe that further investigation or prosecution is warranted." § 592(c)(1). Matters turned over to independent counsel pursuant to the Act [17] might well be handled by the Department of Justice in the absence of the Act; to that extent offices of independent counsel represent a displacement of the executive's prosecutorial role. But the executive functions are performed by an officer independent of the other two branches as well as the executive; the appropriate separation of powers analysis, therefore, is indicated not in *Bowsher*, but in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).[18]

"here-and-now," *see Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3189 n. 5, 94 L.Ed.2d 583 (1986), one would have to posit that independent counsel would have proceeded to engage in an investigative or prosecutorial activity that she would have resisted had she contemplated merely deferential judicial review of an Attorney General's future determination to remove her for cause. This is surely speculation run rampant, all the more so given that the review standard in question was unclear on its face and had not been authoritatively construed. *Cf. In re Sealed Case*, 829 F.2d 50, 61 (D.C.Cir.1987) ("[A]ny harm to [appellant] that is a sufficiently direct and immediate consequence of the Ethics Act must involve an investigative or prosecutorial activity that [independent counsel] would not undertake if he depended for his authority *solely* upon the Attorney General's regulation.") (emphasis in original), *cert. denied*, —— U.S. ——, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988).

16. Nor is there any transfer of authority to Congress. In addition to § 595(e), discussed *supra* pp. 519–20, § 595(a) requires independent counsel to report to Congress "from time to time," and § 595(d) provides for congressional oversight. Neither provision affords the legislature an opportunity for "substantial involvement ... in the enforcement of federal criminal law," as appellants suggest. Brief of Appellant, No. 87–5264 (Appellant's Br. I) at 23. The reporting provision, § 595(a), provides that the "statements and reports shall contain such information as such independent counsel deems appropriate." This requirement to report what independent counsel deems fitting cannot intrude intolerably on independent counsel's autonomy. The oversight provision, § 595(d), is surely less intrusive than the investigation approved in *McGrain v. Daugherty*, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927), discussed *supra* p. 520. *Compare, e.g.*, 50 U.S.C. § 413(a), which requires the Director of Central Intelligence to report to Congress regarding intelligence activities.

17. The Attorney General has the authority to determine whether information initially received is "sufficient to constitute grounds to investigate," § 592(a)(1), and following a preliminary investigation, whether "further investigation or prosecution is warranted." § 592(c)(1). The operation of the Act is mandatory only in the sense that when the Attorney General determines that investigation or prosecution of a covered individual is warranted, he cannot pursue the matter within the Department of Justice but must apply for appointment of an independent counsel.

18. Moreover, it is appropriate to recall a crucial qualification Madison featured in discussing the requirement "that the three great departments of power should be separate and distinct." Referring to the "oracle" on this subject, "the celebrated Montesquieu," Madison wrote:

[Montesquieu] did not mean that these departments ought to have no *partial agency* in, or no *controul* over the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted. This would have been the case in the constitution examined by him, if the King who is the sole executive magistrate, had possessed also the compleat legislative power, or the supreme administration of justice; or if the entire legislative body, had possessed the supreme judiciary, or the supreme executive authority.

THE FEDERALIST No. 47, at 325–26 (J. Madison) (J. Cooke ed. 1961) (emphasis in original).

## B.

Appellants charge that, even absent a transfer of functions, independent counsel's independent exercise of prosecutorial responsibilities itself constitutes an unconstitutional inroad into executive branch territory. Such an incursion, they argue, impairs the executive's ability to fulfill the obligation to "take Care that the Laws be faithfully executed," which in turn threatens the constitutionally-created balance among the three branches of the federal government.[19]

In *Commodity Futures Trading Comm'n v. Schor, supra,* announced the same day as *Bowsher,* the Supreme Court articulated a separation of powers analysis applicable where there is encroachment on—or siphoning off from—one branch but no transfer of function to another. The *Schor* approach, I believe, cannot be written off as good for one day and case alone. In *Schor* the Court considered a statutory scheme which allowed the Commodity Futures Trading Commission (CFTC) to adjudicate garden variety state common law counterclaims interposed in reparation proceedings. That arrangement, the Court held, did not impermissibly diminish the domain of Article III courts. In so ruling, the Court distinguished the *Bowsher* analysis:

Unlike *Bowsher,* this case raises no question of the aggrandizement of congres-

sional power at the expense of a coordinate branch. Instead, the separation of powers question presented in this case is whether Congress impermissibly undermined, without appreciable expansion of its own power, the role of the Judicial Branch.

106 S.Ct. at 3261.

The Court's discrete separation of powers analyses in *Bowsher* and *Schor* should guide our way in this case. Where one branch appropriates the functions of another the separation of powers issue arises most pointedly. In these cases a straightforward, "formalistic" analysis is indeed the order of the day. *See also Immigration & Naturalization Serv. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). But a measure such as the one before us presents a more subtle problem. The danger of creating an imbalance among the three branches by taking some business away from one of them is in all cases a vital concern, but the actual effects of each apparent limitation should be examined with care. A more fluid, functional approach is appropriate if we are to preserve the full range of structural values encompassed under the heading of separation of powers.

*Schor*'s separation of powers analysis turns on the nature and extent of the intrusion, or siphoning off, and the purpose it is designed to serve:

---

**19.** The majority places great weight on the concept of a "unitary executive." *See* Maj. Op. at 488–89. In my colleagues' view, encroachment on the unity of the executive—the singleness of the Presidency—is synonymous with encroachment on the executive's power "to take Care that the Laws be faithfully executed." Their approach suggests that it is a per se constitutional violation to place any check upon absolute executive branch control of prosecution.

However, it is far from evident that the duty to "take Care" was intended to establish unbridled authority in the President and his men. More plausibly, the words were meant to import a limitation:

Indeed, the Framers probably included the "faithful execution" clause in the Constitution to limit, not expand, the President's power. The clause was intended to rule out any power for him to dispense with, or suspend, the execution of the laws. Thus, the President may not always have the power to direct the

execution of the laws, but merely a duty to do so when the laws have not excluded his direction.

Tiefer, *The Constitutionality of Independent Officers as Checks on Abuses of Executive Power,* 63 B.U.L. Rev. 59, 90 (1983) (footnotes omitted). *See also id.* at 90 nn. 151, 152; L. Tribe, American Constitutional Law 253 (2d ed. 1988); Henkin, *Foreign Affairs and the Constitution,* 66 Foreign Affairs 284, 310 (1987/88) (clause obliges President to "take care that the laws [of Congress] be faithfully executed").

The majority slides down a steep slippery slope of its own making in suggesting that my position abides any and all intrusions on the enforcement functions of the executive. *See* Maj Op. at 501, 505. The correct constitutional issue, I believe, is the effect of an intrusion into one branch's assigned functions on the overall balance of powers. *See infra* p. 525 note 20; *supra* p. 523 note 18.

Among the factors upon which we have focused are the extent to which the "essential attributes of judicial power" are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III.

106 S.Ct. at 3258. In the context of removing certain matters from the executive, rather than judicial, branch,[20] *Schor*'s approach counsels a consideration of three factors: the extent of the removal, whether the limitation affects a core executive function, and the purposes of the legislation.

The Ethics Act effects only a limited incursion into executive territory. The Attorney General makes two important decisions at the outset: whether there is sufficient information to conduct a preliminary investigation and, after undertaking such an investigation, whether there are reasonable grounds to believe further investigation or prosecution warranted. § 592(a), (b), (c). These decisions are not subject to judicial review. *See supra* note 4. The Attorney General alone has the power to

remove an independent counsel, albeit he must have cause to do so. § 596(a)(1).[21] Most significantly, the Attorney General's application for independent counsel sets boundaries for the assignment given to independent counsel. In short, the Attorney General exercises very significant authority at the crucial junctures in the process of establishing an office of independent counsel.

In this regard the present case is more like *Schor* than *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), in which a large delegation of judicial powers to bankruptcy judges was held to violate Article III and the separation of powers principle. *Id.* at 58, 102 S.Ct. at 2864. Under the scheme challenged in *Northern Pipeline*, the bankruptcy courts were given jurisdiction over "all civil proceedings arising under title 11 [the bankruptcy title] or arising in or related to cases under title 11." 28 U.S.C. § 1471(b) (Supp. IV 1980). The grant of power also included the ability to hold jury trials, [28 U.S.C.] § 1480; to issue declaratory judgments, § 2201; to issue writs of habeas corpus under certain circumstances, § 2256; to issue all writs necessary in aid of the bankruptcy court's expanded jurisdiction, § 451 (1976

---

**20.** There is no reason to suppose that the *Schor* analysis applies only to the judiciary. Just as the life tenure and salary provisions guarantee the independence of Article III judges, *see Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59–60, 102 S.Ct. 2858, 2865, 73 L.Ed.2d 598 (1982), so the provision for a unitary executive was intended to enable that branch to fulfill its constitutional role. The ability of each of the three branches to perform its assigned functions well is crucial to maintaining the proper balance among them. Here, as in *Schor*, Congress has distributed a portion of the assigned responsibility of one branch to an independent agent. Thus the same value is at stake in both cases: preserving the balance of powers.

It might be argued that intrusion on the executive branch presents a greater threat than intrusion on the judiciary, because of the danger that the remaining political branch—the legislature—might occupy the area vacated by the executive. "Power abhors a vacuum. Unhitching the Independent Counsel from the executive may make the office naturally prone to domination by the branch that represents its primary

competitor." *In re Sealed Case*, 829 F.2d 50, 65 n. 3 (1987) (Williams, J., concurring and dissenting). But here Congress has interposed the judiciary as administrator of the independent counsel provisions, thus securing independence from legislative as well as executive interference.

**21.** In deciding that removal of a special prosecutor should only be for the causes described above, and should only be accomplished by the personal action of the Attorney General, the Committee was attempting to balance the need for independence for a special prosecutor with the desire, for constitutional and other reasons, that the division of the court not be engaged in supervision of the special prosecutor. In order to exercise the removal power, a certain degree of supervision is required and the Committee felt it appropriate that this supervision be conducted by the Attorney General, who is a member of the executive branch of the government.
S.Rep. No. 170, 95th Cong., 1st Sess. 73 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 4216, 4289.

ed. and Supp. IV); see 28 U.S.C. § 1651; and to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of Title 11, 11 U.S.C. § 105(a) (1976 ed., Supp. IV).

458 U.S. at 55, 102 S.Ct. at 2863. Bankruptcy courts thus were given the full authority of Article III courts with respect to any proceeding "related to" a Title 11 claim.

The scheme validated in *Schor*, on the other hand, vested less encompassing authority in the Commission to hear claims that would otherwise be heard in the first instance in court, and the powers of the Commission are more limited than were those of the bankruptcy courts. "[T]he CFTC, unlike the bankruptcy courts under the 1978 Act, does not exercise 'all ordinary powers of district courts,' and thus may not, for instance, preside over jury trials or issue writs of habeas corpus." *Schor*, 106 S.Ct. at 3259.

Under the Ethics Act the independent counsel's assignment is channeled: she is able to pursue only matters falling within the jurisdictional grant; she may not take on, in addition, new matters merely because they are "related to" the assignment she has been given. *See In re Olson*, 818 F.2d 34 (D.C.Cir.Indep.Couns.Div.1987). In this respect, her office cannot be compared with the sprawling commission of the bankruptcy courts examined in *Northern Pipeline*. On the other hand, independent counsel does enjoy, for the particular matter she has been empowered to investigate, virtually "the full authority of the Attorney General." Appellants' Br. II at 14–17. Balancing the two factors—a circumscribed mission, but a full arsenal to accomplish that mission—and taking into account the Attorney General's role in applying, or choosing not to apply, for appointment of independent counsel, I conclude that the Ethics Act effects no intolerably sweeping displacement of executive branch authority.[22]

Appellants contend that the Act tampers with a "core" executive function—prosecution.[23] Though it is indisputably an executive task, *see United States v. Nixon*, 418 U.S. at 693, 94 S.Ct. at 3100, it is not obvious that prosecution is at the "core" of the executive branch's constitutionally-assigned functions, in the sense that the job must be kept, in any and all cases, under the President's wing and cover.

Core executive functions are described in Article II; they include, notably, the President's role as Commander in Chief of the Armed Forces, and his power to make treaties and to grant pardons. *See* U.S. CONST. art. II, § 2. While the executive's powers, unlike those of the legislature, are not limited to those enumerated in the Constitution's text, *see Myers v. United States*, 272 U.S. 52, 118, 47 S.Ct. 21, 26, 71 L.Ed.2d 160 (1926) ("The executive power was given in general terms, strengthened by specific terms where emphasis was regarded as appropriate, and was limited by direct expressions where limitation was needed...."), it seems fair to assume that the powers specifically mentioned were of central concern to the framers. Prosecution was decentralized during the federalist pe-

---

**22.** Appellants advance two additional arguments: that assigning some prosecutorial duties to officers outside the executive branch may result in uneven and unfair application of the laws, and that the absence of executive branch control may permit some activity contrary to U.S. foreign policy. Appellant's Br. I at 25–26. There is no allegation that any conflict with foreign policy has been identified in the present case, and there is no reason to suppose that problems that might arise cannot be handled by district court control on a case-by-case basis. Two points can be made in regard to the charge of uneven application. The framers certainly did not have in their immediate view a centralized federal prosecutorial corps; nominally supervised by the Secretary of State, federal district attorneys were largely independent actors during the Federalist period. L. WHITE, THE FEDERALISTS: A STUDY IN ADMINISTRATIVE HISTORY 406–08 (1948). Second, the Act is designed precisely to prevent uneven application of a different sort: improperly lax investigation and prosecution of high government officials. If unequal treatment is a danger with the Ethics Act, it is also a danger—one of grave concern to Congress—without the Act. *See also infra* p. 527 note 26.

**23.** Appellants advance this characterization in the context of their argument that the President's power to remove independent counsel should be unrestricted, but it is apposite to the present analysis as well. Appellant's Br. I at 31–33.

---

---

---

riod, see L. White, The Federalists: A Study in Administrative History 408 (1948), and it was conducted by district attorneys who were private practitioners employed by the United States on a fee-for-services basis. *Id.* at 406–08. I cannot conclude that the framers, or the Congress that enacted the Judiciary Act of 1789, would have considered prosecution a function that must remain, *sans* exception, with the President and his men.[24]

Though in pertinent respects analogous to the measure challenged in *Schor*, the Ethics in Government Act serves a significantly different legislative goal. The purpose of the Commodity Exchange Act relevant in the *Schor* case was to "create an inexpensive and expeditious alternative forum," 106 S.Ct. at 3260, an objective Congress embraced without adverting to structural considerations. Thus the Court was obliged to evaluate the extent of the conflict between the congressional objective—making available for adjudication of a common law counterclaim a forum more convenient, cheaper, and swifter than an Article III court—and separation of powers principles. In contrast, the Ethics Act is intended to implement those principles.

The framers constructed a government of separated powers with the purpose of "diffus[ing] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 77 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). "The accumulation of all powers legislative, executive and judiciary in the same hands [is] the very definition of tyranny." The Federalist No. 47, at 324 (J. Madison) (J. Cooke ed. 1961). The chosen structure, however, was decidedly not one of absolute separation. *See United States v. Nixon,* 418 U.S. at 707, 94 S.Ct. 3107; *Nixon v. Administrator of GSA,* 433 U.S. 425, 442–43, 97 S.Ct. 2777, 2789–90, 53

L.Ed.2d 867 (1977); *see also supra* note 18. The allocation of legislative, executive, and judicial functions among the three branches was accompanied by a system of checks and balances, so that no branch could use isolation as an instrument of domination. Implementation of the principle of separated powers must look to both features of the constitutional scheme.[25]

The Ethics Act is designed to function as a control against abuse of executive branch power. It implements the checking aspect of the separated powers. The independent counsel provisions of the Act were developed in response to the Watergate era abuses of executive branch powers, abuses which themselves threatened the balance among the three branches of government. The Act is rooted in the principle that "no man can be a prosecutor or judge in his own case." S.Rep. No. 170, 95th Cong., 1st Sess. 5 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 4216, 4221.[26] It is similarly unreasonable to expect an individual to investigate or prosecute his superiors:

> The pressures, the tensions of divided loyalty are too much for any man, and as honorable and conscientious as any individual might be, the public could never feel entirely easy about the vigor and thoroughness with which the investigation was pursued. Some outside person is absolutely essential.

*Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary,* 93d Cong., 2d Sess. 200 (1974) (testimony of Archibald Cox, Watergate Special Prosecutor). The Act thus operates as a means of maintaining the executive's proper—and properly circumscribed—constitutional role.[27] The Act's purpose must be

---

24. *See infra* note 41; *see also* Henkin, *supra* note 19, 66 Foreign Affairs at 286, 290 (framers lacked "comprehensive, coherent conception of [President's] office").

25. As Madison cautioned, because men among the governors as well as the governed are not angels, the departments of government should be divided and arranged so that "each may be a check on the other." The Federalist No. 51, at 349 (J. Madison) (J. Cooke ed. 1961).

26. That the king or his special courts not judge the king's own men and allow them to escape the ordinary processes of justice was of concern to eighteenth century political thinkers. *See, e.g.,* A. de Tocqueville, The Old Regime and the Revolution 73, 77–78 (J. Bonner trans. 1856).

27. The unity of the executive branch was intended to serve the ends of responsibility and accountability. *See* Brief of Amicus Curiae United States (DOJ Br.) at 8 (citing The Federalist No. 70, at 476–77 (A. Hamilton) (J. Cooke ed. 1961)).

given the maximum possible positive weight.[28]

The *Schor* Court validated an encroachment on judicial branch authority. It characterized the incursion as "limited," 106 S.Ct. at 3260, albeit trenching on a core function—the adjudication in the first and only trial instance of traditional state common law contract claims. "The counterclaim asserted in this case is a 'private' right for which state law provides the rule of decision. It is therefore a claim of the kind assumed to be at the 'core' of matters normally reserved to Article III courts." *Id.* at 3259. The Court found the incursion justified by virtue of "the congressional purpose behind the jurisdictional delegation"—creating "an inexpensive and expeditious alternative forum"—and "the demonstrated need for the delegation." *Id.* at 3260. Here we have an incursion on the executive domain which, if it is qualitatively more substantial, is also more blended and connected with the department affected, witness the large initiating and removal role of the Attorney General. *See supra* pp. 520–23. Furthermore, it is not as clearly a disturbance of a "core" function, *see supra* pp. 526–27; and it is intended to serve not merely "legislative convenience," *see Schor,* 106 S.Ct. at 3264 (Brennan, J., dissenting), but to vindicate the precise structural principle against which it must be measured. I conclude that the Ethics

The Ethics Act is in this light complementary; it too promotes the responsibility and accountability of the executive.

**28.** This discussion of Congress' purpose in enacting the Ethics Act is not meant to endorse independent counsel's argument that the Act is constitutionally justified simply because it is needed. *Cf.* Brief of Appellee, Nos. 87–5261, 87–5264, 87–5265 (Appellee's Br. I) at 25–28. The present point is only that Congress' purpose comports with the essential design of checks and balances.

**29.** The House conference report on the 1987 reauthorization of the Act clarifies Congress' intent that "good cause" not be construed to include failure to follow Presidential policy. Explaining their decision not to include a proposed statement to that effect, the conferees state:

While the conferees remain extremely concerned about recent erroneous statements by the Department of Justice that an independent

Act generates no unconstitutional displacement of an executive function.

### C.

Section 596(a)(1) permits removal of independent counsel "only by the personal action of the Attorney General," and only for "good cause" or a physical, mental, or other condition that "substantially impairs the performance" of her duties.[29] Appellants contend that restrictions on the President's[30] power of removal encroach on the exclusively executive domain of prosecutorial discretion. The executive's ability to fulfill the constitutional command faithfully to execute the laws, they argue, requires unrestricted authority to remove officers charged with executive duties.

The Supreme Court has provided some guidance on the question of congressionally-imposed limits on the removal of executive officers. In *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), the Court held unconstitutional a statute which required Senate advice and consent to the President's removal of a postmaster first class, reasoning that "the power of removal of executive officers by the President alone was essential in the division of powers between the executive and the legislative branch." *Id.* at 167, 47 S.Ct. at 42. *Myers'* sweeping language

counsel may be fired for failing to obey any Presidential order—even an order which would compromise the very integrity of an independent counsel's proceedings—the conferees are confident that any court reviewing the removal of such an independent counsel would reject the Department's reasoning.

Independent Counsel Reauthorization Act of 1987, H.R.Conf.Rep. No. 452, 100th Cong., 1st Sess. 37 (1987).

**30.** The President has the power to remove U.S. Attorneys at will, 28 U.S.C. § 541(c), but it is the Attorney General who has the parallel power to remove Assistant U.S. Attorneys. 28 U.S.C. § 542(b). The difference is not significant, since the Attorney General "is the hand of the President in taking care that the laws of the United States ... be faithfully executed." *Ponzi v. Fessenden,* 258 U.S. 254, 262, 42 S.Ct. 309, 311, 66 L.Ed. 607 (1922). Had the Act granted the Attorney General (but not the President) an unrestricted power to remove independent counsel, it is doubtful that any limitation-on-removal challenge would remain.

was narrowed by *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1161 (1935), which upheld a statutory limitation on the President's power to remove Federal Trade Commissioners.[31] The Court found no separation of powers violation because, it said, the commissioners perform "quasi-legislative or quasi-judicial" duties, and "must be free from executive control." *Id.* at 628, 55 S.Ct. at 874.

The Court focused on the latter factor in *Weiner v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958). It held that War Claims Commissioners, who were appointed for fixed terms, were not subject to removal at the President's pleasure, even though Congress had been silent on the question of removal. The Court read the crucial distinction to be that between officers "who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference," *id.* at 353, 78 S.Ct. at 1278; removal powers as to the latter could be restricted. Finally, the Court recently invalidated a statute granting Congress an active role in the removal of the Comptroller General, an officer found to be performing executive functions. *Bowsher v. Synar, supra.*

The holdings of these four cases point to one crucial distinction, between congressional participation in the removal process and congressionally-imposed limits on a power of removal which remains in the executive branch.[32] Congressional participation in removal, not an issue in this case, uniformly has been disapproved. *Myers, supra; Bowsher, supra.* The more difficult question concerns how to define the class of officers whose removal may be subject to restrictions.[33] *Humphrey's Executor* and *Weiner* may be read two ways. Appellants contend that neither case involved officers performing "purely executive" functions; such officers must serve at the President's will. Appellee counters that it was the need for freedom from executive interference that was decisive in those two cases.

Appellants' reading—that Congress *never* may restrict the executive's power to remove "purely executive" officers—places too much weight on the characterization of an officer's function. Like the Comptroller General, FTC Commissioners are charged with responsibility for interpreting and applying acts of Congress, yet implementation of legislative policy was characterized as "quasi-legislative" in *Humphrey's Executor*, 295 U.S. at 628, 55 S.Ct. at 874, "executive" in *Bowsher*, 106 S.Ct. at 3192. The constitutionality of statutory restrictions on the removal power cannot depend on such a problematic question of characterization.[34]

---

**31.** The Federal Trade Commission Act provided: "Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." FTCA, ch. 311, 38 Stat. 717 (1914) (codified at 15 U.S.C. § 41 (1982)).

**32.** This distinction accords with that between a transfer of authority and the lesser step of a limited incursion on, or siphoning off from, another branch's domain. *See supra* pp. 523–24.

**33.** No party or amicus contends that Congress may restrict the President's power to remove *any* executive officer. "[T]here are undoubtedly executive functions that, regardless of the enactments of Congress, must be performed by officers subject to removal at will by the President." *Bowsher*, 106 S.Ct. at 3207 (White, J., dissenting).

**34.** Justice White made this point in his *Bowsher* dissent:

Although the Court in *Humphrey's Executor* characterized the powers of the Federal Trade Commissioner whose tenure was at issue as "quasi-legislative" and "quasi-judicial," it is clear that the FTC's power to enforce and give content to the Federal Trade Commission Act's proscription of "unfair" acts and practices and methods of competition is in fact "executive" *in the same sense as is the* Comptroller's authority under Gramm–Rudman—that is, it involves the implementation, (or the interpretation and application) of an act of Congress. Thus, although the Court in *Humphrey's Executor* found the use of the labels "quasi-legislative" and "quasi-judicial" helpful in "distinguishing" its then-recent decision in *Myers v. United States*, [citation], these terms are hardly of any use in limiting the holding of the case; as Justice Jackson pointed out, "[t]he mere retreat to the qualifying 'quasi' is implicit with confession that all recognized classifications have broken down, and 'quasi' is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed." *FTC v. Ruberoid Co.*, 343 U.S. 470, 487–88 [72 S.Ct. 800, 810,

*Humphrey's Executor* and *Weiner*, therefore, should be read as appellee proposes: the cases validate restrictions on the removal of certain executive officers whose functions require freedom from executive branch supervision. Since Congress' power to create independent offices performing executive tasks is itself subject to separation of powers review and analysis, *see supra* I.B., the "freedom from interference" test also incorporates that review and analysis. A congressional determination that a given task requires independence cannot by itself be sufficient to confer constitutional validity; that approach would cede the separation of powers question to Congress. The "freedom from interference" test must be understood to mean that when Congress has created an office otherwise consistent with separation of powers principles, and which requires independence from "Executive establishment" control—both judicially reviewable matters—Congress may implement the latter purpose by imposing restrictions on the executive's power to remove an individual occupying that office.

There can be no doubt that limiting the President's power to remove independent counsel is essential to the instant legislative scheme. An unrestricted removal power would create a "here and now subservience" that would thwart the goal of independence. Thus the removal restrictions of § 596(a)(1) are permissible under *Humphrey's Executor* and *Weiner*, given that the independence of independent counsel—the mandate to conduct investigations and prosecutions without day-to-day executive branch supervision—itself satisfies the requirements of the separation of powers doctrine. It therefore follows from the result reached in I.B., *supra*, that the removal provision should withstand judicial scrutiny as well.

## II.

Appellants advance two challenges to the Act under the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2.[35] Because independent counsel is not an "inferior Officer," they argue, the constitutional requirement is that she be appointed by the President with the advice and consent of the Senate. Appellants also contend, in the alternative, that even if independent counsel is an inferior officer in the constitutional sense, her appointment may not be vested in a court.

Appellants argue that the class of officers who must be appointed by the President, on advice and consent of the Senate, cannot be limited to those specifically mentioned in Article II, § 2. They maintain that officers who exercise significant authority and discretion, Appellants' Br. II at 21, fit within that category. Appellants concede, however, that neither the Appointments Clause itself nor contemporaneous commentary speaks plainly to the classification question. "In the practical course of the government there does not seem to have been any exact line drawn, who are and who are not to be deemed *inferior* officers, in the sense of the Constitution, whose appointment does not necessarily require the concurrence of the Senate." 2 J. STORY, COMMENTARIES ON THE CONSTITUTION § 1536 (5th ed. 1891).[36] Appellants thus urge this

96 L.Ed. 1081 (1952)] (Jackson, J., dissenting).
*Bowsher,* 106 S.Ct. at 3207 n. 3 (White, J., dissenting).

**35.** [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President

alone, in the Courts of Law, or in the Heads of Departments.
U.S. CONST. art. II, § 2, cl. 2.

**36.** *But cf. United States v. Germaine,* 99 U.S. (9 Otto) 508, 509–10, 25 L.Ed. 482 (1878):
The Constitution for purposes of appointment very clearly divides all its officers into two classes. The primary class requires a nomination by the President and confirmation by the Senate. But foreseeing that when offices became numerous, and sudden removals necessary, this mode might be inconvenient, it was provided that, in regard to officers inferior to those specially mentioned, Congress might by law vest their appointment in the

court to make a substantive determination: whether independent counsel enjoys sufficient responsibility and independence to be held an officer whose appointment must be made in the manner of an ambassador, or a Supreme Court Justice.

The majority has responded to appellants' plea and has reached out to supply a definition of an inferior officer: one who is *subordinate* to a principal officer. Maj. Op. at 484. The majority does not, however, identify the authority for this interpretation. That is not surprising. The only recorded exchange over the prescription "but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments" is this:

> Mr. Madison. It does not go far enough if it be necessary at all—Superior Officers below Heads of Departments ought in some cases to have the appointment of the lesser offices.

> Mr. Govr Morris There is no necessity. Blank commissions can be sent—

2 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 627 (September 15) (M. Farrand ed. 1911). Madison thus suggested that the clause on which this case first turns for my colleagues was of no great moment in the framers' debate, and indeed is not self-defining. Significantly, Madison called "Superior" an officer my colleagues would no doubt dub "inferior"—someone below a department head and thus *subordinate*.

What can one make of the various appellations to which the framers made reference—"inferior," "Superior," "lesser," "principal"? Only this, I believe. One cannot place too much stock in "original intent" as it applies to the appointment of nonjudicial officers other than those specifically enumerated in the Appointments Clause. And surely one cannot rest one's decision in this grand constitutional controversy on contemporary definitions of modi-

fying terms the founding fathers failed to pin down.

Appellee points out that this court recently validated the Attorney General's appointment, within the Department of Justice, of an independent counsel charged with exactly the duties and responsibilities enjoyed by independent counsel under the Act. *In re Sealed Case*, 829 F.2d 50 (D.C. Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988). Independent counsel therefore must be an inferior officer, she argues, because the Attorney General may not constitutionally appoint any other kind of officer. The majority counters that the Attorney General's power to rescind the regulation pursuant to which a Justice Department "independent" counsel is appointed renders such officers subordinate and hence inferior. Maj. Op. at 484–85. The majority's response begs the question. Were the nature and scope of an officer's duties—rather than the majority's "subordinate" construct—the determining factor, independent counsel would have to be counted an inferior officer, for the reason appellee advances.

Appellee also emphasizes *Ex Parte Siebold*, 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1880), in which the Supreme Court upheld a statute assigning courts the responsibility for appointing certain election commissioners, who therefore must be inferior officers. These commissioners had no superiors. The ground on which the majority distinguishes *Siebold* is not entirely clear. The opinion first suggests that the election commissioners' responsibilities were more limited than those of independent counsel, Maj. Op. at 485, but goes on to hint that it is in some way significant that the commissioners, unlike independent counsel, "were not clearly within any of the three branches." *Id.* at 486.

In short, the majority cannot sustain its own argument that subordinacy alone determines whether an officer is inferior or

---

President alone, in the courts of law, or in the heads of departments.

It is not necessary for the resolution of this case to decide whether heads of departments should

non-inferior in the constitutional sense.[37] The status of independent counsel—clearly not equivalent to a department head in the nature and scope of her duties, but also not subject to day-to-day supervision by a hierarchic superior—defies facile classification.[38] Because the founding fathers did not settle the question, I regard the matter as one on which Congress' judgment is owed a large measure of respect—deference of the kind courts accord to myriad constitutional judgments Congress makes, for example, most judgments about what classifications are compatible with the command that all persons shall enjoy "the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

Congress has the authority to create both categories of offices—those the President must fill with the Senate's concurrence and "inferior" ones. Thus the present question is not one of pure or abstract categorization; rather, it concerns the legitimacy of a classification made by Congress pursuant to its constitutionally-assigned role in vesting appointment authority. That constitutional assignment to Congress counsels judicial deference. The chosen mode of appointment here indicates that Congress meant to create an inferior office. That intention alone is not dispositive of the constitutional issue, for it is common ground that Congress does not have the "final say." *See* Maj. Op. at 487

n. 20. But judicial review must fit the occasion. Where, as in the matter at hand, the label that better fits an officer is fairly debatable, the fully rational congressional determination surely merits more tolerance than my colleagues accord it. The arguments advanced by appellants and by the majority, that independent counsel ought to be considered an officer similar in stature to heads of departments, in sum, are insufficiently compelling to justify upsetting Congress' considered judgment on the matter. I conclude that independent counsel is an inferior officer within the meaning of the Appointments Clause.

Appellants contend that even if independent counsel is an inferior officer, she cannot constitutionally be appointed by a court. The exceptions clause, all participants in this case agree, admits of more than one interpretation. Appellants argue that the clause must be read to permit the vesting of the power to appoint inferior officers only within the branch, or the department, in which they are to serve. Appellee argues that there is no express constitutional limitation; Congress may vest the appointment of any inferior officer in the President, the courts, or department heads.

In *Ex Parte Siebold, supra,* the Supreme Court adopted an interpretation of the exceptions clause similar to that advanced by

---

be counted among the officers "specially mentioned."

**37.** Appellants themselves reject the argument advanced by the Department of Justice, *see* DOJ Br. at 13–14, and adopted by the majority, Maj. Op. at 484, that subordinacy alone determines inferior status. Appellants' Reply Br. II at 2 n. 3. Even heads of departments, they note, have a superior: the President. *See also* Appellee's Br. I at 38 n. 38.

**38.** The district court held independent counsel an inferior officer, relying in part on the fact that "he [sic] is appointed for a single task to serve for a temporary limited period." July 20, 1987 D.D.C. Memorandum at 3 (quoting *In re Olson,* 818 F.2d at 44), and on *United States v. Eaton,* 169 U.S. 331, 343, 18 S.Ct. 374, 379, 42 L.Ed. 767 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under

special and temporary conditions, he is not thereby transformed into the superior and permanent official.").

The majority, on the other hand, suggests that independent counsel's responsibilities are comparable to those of a department head: "[I]t could well be argued that independent counsel, who often supervise more employees than cabinet departments once employed, are themselves 'heads of departments[.]'" Maj. Op. at 487. Whatever the merit of this anachronistic argument, it is the law of this circuit that the Attorney General may appoint an independent counsel with the exact duties granted under the Act, constrained only by the practically remote possibility that the regulation could be revoked and the appointment thereby terminated. *In re Sealed Case,* 829 F.2d 50 (D.C.Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988). The nature and scope of the duties of such an appointee, our precedent thus affirms, fit those of an inferior officer.

independent counsel.[39] The Court said, "[b]ut as the Constitution stands, the selection of the appointing power, as between the functionaries named, is a matter resting in the discretion of Congress." *Id.*, 100 U.S. at 397–98. The Court also suggested, however, that inter-branch appointments might be subject to an implied requirement of "congruity": "[T]he duty to appoint inferior officers, when required thereto by law, is a·constitutional duty of the courts; and in the present case there is no such incongruity in the duty required as to excuse the courts from its performance, or to render their acts void." *Id.*, 100 U.S. at 398.

An inter-branch appointment would indeed fail the test of congruity if it violated the separation of powers doctrine. The majority argues that assigning to one branch the appointment of an officer whose duties are central to the role of a different branch would violate the separation of powers and thus would be incongruous. Maj. Op. at 494.[40] I am in accord with my colleagues as to the principle, but do not agree with their application of it in this concrete case. Vesting the appointment of independent counsel in the Special Division is not incongruous because, as set forth at I.A. and I.B., *supra,* the Ethics Act neither unduly displaces executive branch prerogatives, nor transfers supervision of the prosecutorial function to the judiciary.[41]

Appointment of independent counsel by a court meets the test of statutory congruity as well. It would be incongruous in the extreme, given the purposes of the Act, to vest appointment of independent counsel in the President, and the same would be true of heads of departments, themselves serving at the President's pleasure. The Ethics Act was designed in part to serve as an assurance that high executive officials would not receive especially favorable

**39.** It is quite clear that the *Siebold* court was interpreting the Appointments Clause and not, as the majority opinion suggests, merely asking whether the act in question imposed "duties not judicial" on the circuit court. *See* Maj. Op. at 493. It is also clear that *Siebold* distinguished *Hayburn's Case,* 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792). The authority to appoint inferior officers was found in the Appointments Clause; *Hayburn's Case* had considered an Article III challenge. *Id.,* 2 U.S. at 398.

**40.** The majority reads *Siebold* not to implicate the separation of powers issue. Maj. Op. at 493. I disagree: the election commissioners had enforcement responsibilities, and even if the character of their duties is not entirely certain, *see* 100 U.S. at 397, the separation of powers inquiry remains apt, under the incursion, albeit no transfer, heading. *See supra* pp. 523–24.

**41.** At least some members of the First Congress shared the view that judicial appointment of federal prosecutors was constitutionally permissible. The first Judiciary Act as reported by the Senate Judiciary Committee provided:

[E]ach District Court shall appoint a meet Person learned in the Law to act as Attorney for the United States in such District, and shall swear him to the faithful Execution of his Office, whose duty it shall be to [prosecute] in such District all Delinquents for Crimes & Offences, cognizable under the authority of the United States and all [ci]vil Actions [in which the United States shall be

concerned] ... And he shall receive as a compensation for his services such Fees as shall be taxed therefor in the respective Courts before which the Suits or Prosecutions shall be—And the Supreme Court shall also appoint a meet person learned in the Law to act as Attorney General for the United States ... whose duty it shall be to prosecute and conduct all Suits in such Court in which the United States shall be concerned, and to give [his] advice and opinion upon Questions of Law when required by the President of the United States, or when requested by the Heads of any of the Departments[.]

DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, 1789–1791, 5 LEGISLATIVE HISTORIES 1193–94 (1986) (Senate Bill 1 as reported to the Senate by committee member Senator Richard Henry Lee of Virginia, June 12, 1789).

The majority's argument that the change to Presidential appointment "may have been motivated by constitutional concerns," Maj. Op. at 492, is entirely speculative. The letter from Robert Livingston quoted by the majority was cited by the House of Representatives' Brief in support of the proposition that the decision regarding the appointment of prosecutors was one of "discretionary choice," not constitutional compulsion. Brief of Amicus Curiae House of Representatives at 28. The House emphasizes what Livingston thought would be "better." My colleagues place the emphasis elsewhere. No winner can be declared in debate of this order. In matters so shrouded in doubt, resort to lines later penned by framers "is often not fruitful," surely never "determinative." *See* Henkin, *supra* note 19, 66 FOREIGN AFFAIRS at 286, 290, 307.

treatment under the law.[42] That purpose would be undercut by a strictly intra-branch appointment process. The appearance and reality of impartiality are well served by locating the appointment of independent counsel in the least political, least partisan branch of government. I conclude that the Appointments Clause permits vesting the appointment of independent counsel, an inferior officer in the constitutional sense, in a "court of law." [43]

### III.

The Ethics in Government Act violates Article III of the Constitution, appellants contend, by assigning courts responsibilities not encompassed within the "case or controversy" requirement of Article III, § 2. This argument is, in a sense, the obverse of that considered in I.A., *supra.* Any transfer of functions from one branch to another creates two potential violations: the diminution of the duties assigned one branch, and the allocation of inappropriate responsibilities to the other.[44] Although it was established in I.A., *supra,* that there is no impermissible transfer of prosecutorial decisionmaking to the Special Division under the Act, a further Article III claim remains. Appellants maintain that *any* assignment of nonjudicial tasks violates Article III; it was acknowledged in I.A. that the Special Division performs some administrative tasks under the Act, short of a supervisory role.

Appellee argues, in my view correctly, that the Appointments Clause authorizes the selection of independent counsel by a court. *See supra* pp. 532–34. Article III cannot be read to exclude the possibility of lodging in a court any appointment responsibility outside the third branch, for that would render the Appointments Clause

prescription superfluous. Appellee further asserts that the power to define independent counsel's jurisdiction is incidental to the appointment power, and so is similarly authorized by Article II, § 2, cl. 2.

Appellants maintain that the power to define independent counsel's jurisdiction "compels the Division to make substantive law enforcement decisions." Appellant's Br. I at 40. In fact, the Special Division merely assigns independent counsel an area of responsibility, closely tailored, as noted *supra* p. 521, to the Attorney General's application. It would be impossible for the Division to appoint independent counsel without in some manner defining—and restricting—the scope of her authority.[45] When an appointment is made to a preexisting office, the title of the office may be all that is needed to define the duties of the new appointee. But where a statute provides for ad hoc appointments, such that the office itself must be defined at the time of appointment, the power to define is a necessary incident of the power to appoint.[46]

Appellants also contend that the Special Division's resolution of independent counsel's application for referral of certain allegations against appellants Dinkins and Schmults constitutes a supervisory function violative of Article III. However, the Division's handling of independent counsel's application is entirely consistent with the "case or controversy" requirement. The Department of Justice filed a Response opposing the application, and independent counsel replied to the Department's Response. *In re Olson,* 818 F.2d 34, 35 (D.C. Cir.Indep.Couns.Div.1987). Thus the application was reviewed in a contested proceeding, with opposing views presented by parties possessing "such a personal stake in

---

**42.** *See supra* p. 527 note 26.

**43.** Even absent the responsibility for reviewing removal of an independent counsel, *see supra* p. 520 note 7, the Special Division clearly is a court of law. *See infra* pp. 534–35.

**44.** *Compare* the majority opinion at 511–17, maintaining that the court serves as independent counsel's day-to-day supervisor. That argument is presented under an Article III rubric; it could equally be styled a separation of powers claim.

**45.** *Compare* 28 U.S.C. § 515(a), which requires that a special U.S. Attorney be "specifically directed" before "conduct[ing] any kind of legal proceeding."

**46.** Advising independent counsel of her conflict of interest status similarly is an integral part of the process of defining her office and responsibilities. *See* D.C. Cir. Indep. Couns. Div. Order, No. 86–1, filed June 18, 1986 (under seal).

the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The Division provided a full and reasoned explanation of its decision. *See In re Olson, supra.* There seems little basis for the charge that the Division fell short of Article III requirements.

The essence of appellants' complaint, and of the majority's response to it, is that the Special Division's authority to resolve such questions as an application for expanded jurisdiction renders it independent counsel's de facto supervisor.[47] That charge is more properly understood as a separation of powers claim, and was addressed as such *supra* at I.A. Nothing in the Act, however, prevents the Special Division from handling those jurisdictional issues assigned to it in a manner consistent with Article III, as it has done in the present case.[48] I conclude that each administrative task assigned the Special Division under the Act is either an incident of the power to appoint, or one that has been performed in the context of an adversarial proceeding. There is no violation of Article III.

## IV.

Appellant Olson advances a statutory claim: that the Special Division could not, consistently with the Act, define independent counsel's jurisdiction to include investigation of possible conspiracy charges against Olson.

Independent counsel Morrison applied to the Special Division for jurisdiction to investigate allegations against two additional Department of Justice officials, urging in part that "the known facts raise a reasonable suspicion that Olson, Schmults, and Dinkins may have acted together...." Reply to Department of Justice Response to Independent Counsel's Application for Re-

ferral of Related Matters Pursuant to 28 U.S.C. § 594(e), at 11 (filed March 9, 1987). The Special Division denied independent counsel's request regarding Schmults and Dinkins, reading the Act to mean that the Attorney General's prior decision not to refer allegations against those two individuals precluded any such referral by the court. *In re Olson*, 818 F.2d at 47. The court did, however, interpret its original grant of jurisdiction as to Olson to include possible conspiracy charges. *Id.* at 47–48. Olson argues that this interpretation is precluded by the reasoning the court applied to the Schmults and Dinkins allegations: since the Attorney General had not specifically referred the conspiracy charges, the court could not do so.

I find Olson's claim premature. In *Deaver v. Seymour*, 822 F.2d 66 (D.C.Cir.1987), this court held unripe a preindictment challenge to the constitutionality of the Ethics Act, citing the policy against preindictment challenges to "defects in the institution of the prosecution." *Id.* at 70. In *In re Sealed Case*, 829 F.2d 50 (D.C.Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988), we held unripe Oliver North's similar constitutional claim, given the valid parallel appointment of independent counsel by the Attorney General, because "any harm to North that is a sufficiently direct and immediate consequence of the Ethics Act must involve an investigative or prosecutorial activity that Walsh would not undertake if he depended for his authority *solely* upon the Attorney General's regulation." *Id.* at 61. Analogously, Olson's statutory claim can be deemed ripe only if he can show that the contempt order on appeal here, or the underlying subpoena, would not have issued but for the court's having included conspiracy allegations in its interpretation of the jurisdictional grant. No such showing—or allegation—has been made. I therefore decline to reach the merits of Olson's statutory claim.

---

**47.** The majority's argument that the Special Division exercises supervisory powers over independent counsel, Maj. Op. at 511–17, I note, is less than fully consistent with my colleagues' earlier position that independent counsel is a principal or non-inferior officer because she has no superior. Maj. Op. at 481–87.

**48.** There is no reason to suppose that the Special Division will not continue to resolve statutorily-assigned questions as they may arise—*e.g.*, termination under § 596(b)(2)—in the context of adversarial proceedings.

## CONCLUSION

The Ethics in Government Act is a carefully considered congressional journey into the sometimes arcane realm of the separation of powers doctrine, more particularly, into areas the framers left undefined. The Act is designed to prevent Congress' own appropriation of the functions it insulates from executive supervision, and it implements a fundamental control essential to our Constitution's doctrine of separated powers: the control of mutual checks. It is a measure faithful to the eighteenth century blueprint, yet fitting for our time. I find the Ethics Act constitutional, and would affirm the judgments of the district court.